2012 Ark. 280

**Mackenzie PICKERING, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 12–19.**

Supreme Court of Arkansas.

June 21, 2012.

Hugh R. Laws, Laws Law Firm, P.A., Russellville, for Appellant.

Dustin McDaniel, Atty. Gen., Christian Harris, Asst. Atty. Gen., for Appellee.

JIM GUNTER, Justice.

⏐₁Appellant was found guilty of underage driving under the influence and now appeals the denial of his motion to suppress the results of his breathalyzer test. On appeal, he argues that the arresting officer was acting outside of his territorial jurisdiction when he transported appellant to a different county to perform the breathalyzer test and that the test results were thus unlawfully obtained. We accepted certification of this case because it involves an issue of first impression and needing clarification; therefore, this court has jurisdiction pursuant to Ark. Sup.Ct. R. 1–2(d). We affirm the denial of the motion to suppress.

On August 8, 2010, Deputy Shawn Harris of the Pope County Sheriff's Office initiated a traffic stop on a vehicle driven

by appellant after observing the vehicle travel onto the shoulder and cross the center line. Harris detected an odor of intoxicants on appellant's breath and observed that appellant's eyes were bloodshot and slightly glassy. After performing a series of field sobriety tests, Harris placed appellant, who was nineteen years old at the time, under ₂arrest for suspicion of underage driving under the influence (DUI). Harris then transported appellant to the Dardanelle Police Department, in Yell County, where Harris read appellant his DUI statement of rights. Appellant agreed to take a breathalyzer test, and the result revealed a blood-alcohol level of .065.[1] Appellant was later found guilty of underage DUI in the Pope County District Court and timely appealed to the Pope County Circuit Court.

On May 24, 2011, appellant filed a motion to suppress. In the motion, appellant argued that after his arrest, he was transported from Pope County to Yell County, which was outside of Harris's jurisdiction. Appellant argued that he was illegally detained in Yell County and asked the court to suppress all evidence, namely the results of the breathalyzer test, stemming from this illegal detention. In response, the State argued that Arkansas law did not prevent a certified law-enforcement officer from transporting a lawfully arrested person outside the officer's territorial jurisdiction to obtain evidence, or in the alternative, that appellant had waived any argument regarding the seizure of this evidence by consenting to the breathalyzer test.

A hearing on the motion to suppress was held on July 18, 2011. At the hearing, Harris explained that he transported ap-

pellant to the Dardanelle Police Department because he was not certified to operate the new blood-alcohol content (BAC) analysis machine, the BAC Intoxilyzer, which had been installed at the Pope County Sheriff's Office and the Russellville ₃Police Department. Harris testified that these were the only two BAC analysis machines located in Pope County, and because he had only recently returned from medical leave, he had not yet been certified to operate the machines. Harris also explained that at the time of the arrest, which was approximately 2:33 a.m., there was only one other officer working, who was busy on another call, so there was no other option but to transport appellant to another county to conduct the BAC test. Harris testified that once he and appellant arrived at the Dardanelle Police Department, he read appellant his DUI statement of rights, appellant understood his rights, and appellant agreed to the test.

On cross-examination, Harris admitted that he had not checked with the Russellville Police Department to see whether it had an officer available that could administer the BAC test to appellant. He also agreed that St. Mary's Hospital, which is in Pope County, could have performed a blood or urine test and that a urine sample could have been taken and sent to the State Crime Lab for testing. But Harris clarified that the standard policy is to use a BAC machine.

After hearing arguments from counsel, the court took the matter under advisement. In an order filed July 26, 2011, the court denied the motion to suppress and explained that "Deputy Harris was justified under these circumstances in transporting Defendant out of his jurisdiction

---

1. Pursuant to Ark.Code Ann. § 5–65–303(b) (Repl.2005), it is unlawful for an underage person to operate or be in actual physical control of a motor vehicle if the underage person has a blood-alcohol level of "two-hundredths (0.02) but less than eight-hundredths (0.08)."

and did not lose custody. The test had to be given without delay and in accordance with Health Department regulations." Thereafter, on September 12, 2011, a bench trial was held, at which appellant was found guilty of underage DUI. In a judgment ⌊4filed September 14, 2011, appellant was sentenced to pay costs of $300, to pay a fine of $250, to perform twenty hours of community service, and to attend an alcohol-safety program for underage drivers. Appellant filed a timely notice of appeal on October 11, 2011.

 On appeal, appellant contends that the circuit court erred in denying his motion to suppress. In reviewing the denial of a motion to suppress evidence, this court conducts a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State,* 351 Ark. 406, 94 S.W.3d 892 (2003). A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after review of the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Lee v. State,* 2009 Ark. 255, 308 S.W.3d 596. We defer to the superiority of the circuit judge to evaluate the credibility of witnesses who testify at a suppression hearing. *Montgomery v. State,* 367 Ark. 485, 241 S.W.3d 753 (2006).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. V. The United States Supreme Court has held that the compulsory administration of a blood test is subject to the constraints of the Fourth Amendment, *see Schmerber v. California,* 384 U.S. 757, 86

S.Ct. 1826, 16 L.Ed.2d 908 (1966), and has further held that "subjecting a person to a breathalyzer test, which generally requires the production of alveolar ⌊5or 'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber,* should also be deemed a search." *Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 616–17, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal citations omitted).

The issue in this case is whether the breathalyzer test administered by Deputy Harris, outside of his territorial jurisdiction, was an unlawful search under the Fourth Amendment. The authority of municipal corporations to exercise powers beyond their territorial limits must be derived from state statute, and the Arkansas General Assembly has codified four instances in which local police officers are authorized to act outside their territorial jurisdiction: (1) "fresh pursuit" cases, *see* Ark.Code Ann. § 16–81–301 (Repl.2005); (2) when the officer has a warrant for arrest, *see* Ark.Code Ann. § 16–81–105 (Repl.2005); (3) when a local law enforcement agency requests an outside officer to come into the local jurisdiction, and the outside officer is from an agency that has a written policy regulating its officers when they act outside their jurisdiction, *see* Ark. Code Ann. § 16–81–106(c)(3)–(4) (Supp. 2011); (4) when a county sheriff requests that a peace officer from a contiguous county come into that sheriff's county and investigate and make arrests for violations of drug laws, *see* Ark.Code Ann. § 5–64–705 (Repl.2005). *See also Perry v. State,* 303 Ark. 100, 794 S.W.2d 141 (1990).

In the present case, appellant contends that none of these instances are applicable, that Deputy Harris's jurisdiction ended when he took appellant out of Pope County and into Yell County, that his subsequent

detention in Yell County was unlawful, and that the evidence obtained during that unlawful detention should have been suppressed. In support, appellant [6]cites to *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), which makes clear that the Fourth Amendment applies to both "arrests" and "investigatory detentions." *Id.* at 727, 89 S.Ct. 1394. The relevant facts from *Davis* are as follows:

> [A] rape occurred on the evening of December 2, 1965, at the victim's home in Meridian, Mississippi. The victim could give no better description of her assailant than that he was a Negro youth. Finger and palm prints found on the sill and borders of the window through which the assailant apparently entered the victim's home constituted the only other lead available at the outset of the police investigation. Beginning on December 3, and for a period of about 10 days, the Meridian police, without warrants, took at least 24 Negro youths to police headquarters where they were questioned briefly, fingerprinted, and then released without charge. The police also interrogated 40 or 50 other Negro youths either at police headquarters, at school, or on the street. Petitioner, a 14–year–old youth who had occasionally worked for the victim as a yardboy, was brought in on December 3 and released after being fingerprinted and routinely questioned. Between December 3 and December 7, he was interrogated by the police on several occasions—sometimes in his home or in a car, other times at police headquarters. This questioning apparently related primarily to investigation of other potential suspects.
>
> . . . .
>
> On December 12, the police drove petitioner 90 miles to the city of Jackson and confined him overnight in the Jack-

son jail. The State conceded on oral argument in this Court that there was neither a warrant nor probable cause for this arrest. The next day, petitioner, who had not yet been afforded counsel, took a lie detector test and signed a statement. He was then returned to and confined in the Meridian jail. On December 14, while so confined, petitioner was fingerprinted a second time. That same day, these December 14 prints, together with the fingerprints of 23 other Negro youths apparently still under suspicion, were sent to the Federal Bureau of Investigation in Washington, D.C., for comparison with the latent prints taken from the window of the victim's house. The FBI reported that petitioner's prints matched those taken from the window. Petitioner was subsequently indicted and tried for the rape, and the fingerprint evidence was admitted in evidence at trial over petitioner's timely objections that the fingerprints should be excluded as the product of an unlawful detention.

*Id.* at 722–23, 89 S.Ct. 1394. The fingerprint evidence that was used at trial was obtained on December 14, while petitioner was still in detention following his December 12 arrest. The State, although [7]conceding that the arrest on December 12 and subsequent detention were based on neither a warrant nor probable cause, and were therefore constitutionally invalid, nevertheless argued that petitioner's conviction should be affirmed because the December 3 fingerprints were validly obtained. The United States Supreme Court disagreed, however, that the December 3 prints were validly obtained, holding that the detention on December 3, while investigatory in nature, was still subject to Fourth Amendment protections:

> [N]o attempt was made here to employ procedures which might comply with the

requirements of the Fourth Amendment: the detention at police headquarters of petitioner and the other young Negroes was not authorized by a judicial officer; petitioner was unnecessarily required to undergo two fingerprinting sessions; and petitioner was not merely fingerprinted during the December 3 detention but also subjected to interrogation.

*Id.* at 728, 89 S.Ct. 1394.

In the present case, appellant compares his case to *Davis* and contends that "[t]he only difference in *Davis* and this case, as far as the unlawful detention is concerned, is that instead of fingerprints being obtained during the unlawful detention, the evidence against Appellant was obtained as a result of a breathalyzer test." Appellant also argues that, like the officers in *Davis*, the officer in this case made no attempt to comply with procedures as required by the Fourth Amendment.

Appellant also cites *State v. Marran*, No. 94–0525A, 1996 WL 937019 (R.I.Super. Dec. 6, 1996), an unpublished opinion from the Rhode Island Superior Court. In *Marran*, the defendant was stopped for driving the wrong way on a one-way street, and the officer suspected that the defendant was driving under the influence of alcohol. The defendant was taken into custody and transported to the Newport police station, where he was read his rights and consented to a breathalyzer test. The officer administered a breathalyzer test at 1:03 a.m., but the results were invalid. The officer waited one minute and administered another test, but was again unsatisfied with the result. (It was later determined that there was a problem with the Newport Police Department's breathalyzer machine.) The officer transported the defendant to the Middletown Police Department and administered another breathalyzer test over the defendant's ob-

jections. The third breathalyzer test was administered at 1:40 a.m.; at 2:47 a.m., a fourth and final breathalyzer test was administered.

The defendant was later found guilty in district court of driving under the influence and the one-way-street infraction. The Rhode Island Supreme Court, however, found that in light of the absence of a required one-way-street sign, the defendant could not have committed the one-way-street infraction. Regarding the DUI charge, the Superior Court held that because the defendant "was stopped for committing what has been determined to be a lawful act by our Supreme Court, the exclusionary rule applies in the instant case and Marran's motion to suppress is hereby granted." *Id.* at \*3. Relevant to the instant case, the court also held that the breathalyzer-test results obtained in Middletown should be suppressed as the "product of an unlawful detention of Marran outside of the jurisdiction of that law enforcement agency." *Id.* at \*8. The court found that there were reasonable alternative tests available and that no emergency existed; thus, the Newport Police Department's authority ceased to exist over the defendant as soon as he was transported outside the city limits of Newport and into Middletown. The court concluded, "The strong public policy of jurisdictional integrity placed an affirmative duty upon the Newport Police Department to exhaust all reasonably available alternative testing options within the city limits of Newport before Marran could be taken to Middletown for additional breathalyzer testing." *Id.* at \*10.

Finally, appellant also cites *Thomas v. State*, 65 Ark.App. 134, 985 S.W.2d 752 (1999), which presented the following facts:

On February 15, 1997, Trooper Barry Saffold of the Arkansas State Police was contacted on his radio by Chief

McBride, the chief of police for the City of Gould, Arkansas. Chief McBride informed Trooper Saffold that he had received a report of a driver that was possibly intoxicated headed northbound on U.S. Highway 65. The officers surmised that the reported vehicle was somewhere between them. Trooper Saffold proceeded south from Grady while Chief McBride traveled north from Gould. Chief McBride was the first officer to make contact with the red passenger car driven by appellant. He stopped appellant's vehicle outside the city limits of Gould, approximately halfway between Gould and Grady. When Trooper Saffold arrived, Chief McBride had appellant outside his vehicle, and according to the testimony of Trooper Saffold, appellant was not free to leave.

Trooper Saffold stated that he detected the odor of intoxicants and administered numerous sobriety tests, which appellant failed. Appellant was transported to Gould where he registered .14 on a Breathalyzer test. He was subsequently charged with driving while intoxicated.

*Id.* at 135–36, 985 S.W.2d at 753. Because the State acknowledged that Chief McBride stopped and detained the appellant outside his territorial jurisdiction without a warrant, and the stop and detention did not fit any of the four situations wherein an officer may arrest outside his territorial jurisdiction, the court of appeals reversed the denial of the appellant's motion to suppress.

In conclusion, appellant argues that under Ark. R.Crim. P. 4.6, any arrested person must be taken promptly to a jail, police station, or other similar place, and can be taken to some other place only if requested by the arrested person or if necessary to have the arrested person identified. Appellant asserts that in his case, he did not ask to be taken to Yell County, nor was it necessary for his identification. Appellant also contends that Harris had "more than sufficient time and opportunity" to follow the law and that there was no urgency presented. Appellant concludes that there is "nothing in the law of the State of Arkansas which authorizes an individual to be taken outside the jurisdictional limits of the place of his arrest."

In response, the State argues that the breathalyzer test was a valid search that was performed (1) with appellant's consent and (2) pursuant to the "valid exigent circumstance of appellant's falling blood alcohol content." First, the State explains that under the implied-consent provision of the Underage DUI Law, any underage person who operates a motor vehicle or is in actual physical control of a motor vehicle is deemed to have given consent to a chemical test of his or her blood, breath, or urine for the purpose of determining the alcohol content of his or her breath or blood if the underage person is arrested for any offense alleged to have been committed while under the influence of alcohol. *See* Ark.Code Ann. § 5–65–309(a)(1) (Repl. 2005). Further, appellant also consented by signing the consent form before the breathalyzer test was given.

Second, the State argues that the search was not unreasonable because Harris had a reasonable explanation for performing the breath test in Yell County and time was a valid exigent circumstance in this case. As the circuit court explained in its order, the test had to be given "without delay," and the State contends that this ruling comports with the United States Supreme Court case law as well as this court's case law. *See Stephens v. State,* 320 Ark. 426, 898 S.W.2d 435 (1995) (noting that this court has repeatedly observed that blood-alcohol content decreases with

the passage of time). The State observes that appellant's argument is based solely on the location of the search; however, the State asserts that the fact that the search took place in a neighboring county does not render the search per se unreasonable.

The State also distinguishes the case law cited by appellant by noting that the cases that discuss the four instances authorizing a police officer to act outside his or her jurisdiction, namely *Perry, supra,* and *Thomas, supra,* are inapplicable, because the enumerated instances pertain only to an officer's authority to apprehend an offender. Contrary to appellant's interpretation, the State argues, the word "act" as it is used in *Perry* is a synonym for "arrest." The State also distinguishes *Davis, supra,* by asserting that the "warrantless dragnet in *Davis* bears no resemblance to Appellant's alcohol-impaired, late-night encounter with Deputy [Harris]."

■ We find no error in the circuit court's denial of the motion to suppress. First, we note that appellant's characterization of *Davis* is inaccurate, rendering his reliance on that case misplaced. In his brief, appellant describes *Davis* as follows: "*Davis* involved the detention of a defendant for the purposes of obtaining fingerprints. The evidence obtained as a result of the detention outside the jurisdictional limits of the arresting officer violated the Fourth |₁₂Amendment and the evidence so obtained was suppressed." However, the fact that the officers drove the petitioner to another jurisdiction during his second detention is not discussed and does not appear to be a factor in the court's decision. Thus, the holding in *Davis* has limited applicability in the present case.

Appellant's interpretation of *Perry* and its progeny is likewise inaccurate. While *Perry* did use the word "act," it is clear from the opinion that the court was referring to an officer's authority to *apprehend* an offender. *See Perry,* 303 Ark. at 102, 794 S.W.2d at 142 ("A local peace officer acting without a warrant outside the territorial limits of the jurisdiction under which he holds office is without official power to apprehend an offender, unless he is authorized to do so by state statute."). Similarly, the court of appeals case cited by appellant, *Thomas,* refers to the "four instances where officers may *arrest* outside their territorial jurisdiction." 65 Ark.App. at 136, 985 S.W.2d at 753 (emphasis added); *see also Martinez v. State,* 352 Ark. 135, 98 S.W.3d 827 (2003) ("arrest"); *Arnett v. State,* 342 Ark. 66, 27 S.W.3d 721 (2000) ("arrest"); *Henderson v. State,* 329 Ark. 526, 953 S.W.2d 26 (1997) ("apprehend").

Finally, the Rhode Island case cited by appellant, *Marran,* also has limited applicability in the present case, because not only is it an unpublished opinion from a lower court, but also, the Rhode Island Supreme Court has declined to follow *Marran's* reasoning. *See State v. Hagan,* 819 A.2d 1256 (R.I.2003). In *Hagan,* the defendant was arrested by members of the Portsmouth Police Department on suspicion of driving under the influence of alcohol and taken to the Portsmouth police station. Hagan consented to a chemical test; however, Officer |₁₃Sullivan, the test operator, detected a problem with the breathalyzer machine. After notifying his supervisor of the problem, Sullivan was instructed to transport Hagan to the Middletown Police Department and to use that department's breathalyzer machine. At trial, Hagan argued that the Portsmouth police had no authority to retain custody of him after crossing the town line into Middletown and that the breathalyzer test results obtained in Middletown should have been suppressed. The trial court, relying on *Marran,* granted the motion to sup-

**150**

press. In reversing, the Rhode Island Supreme Court explained:

> [W]e consistently have drawn the distinction between an arrest of a suspect that must, both constitutionally and by statute, rest upon probable cause, from the circumstance in which a prisoner, already in lawful custody, is taken outside a municipality for legitimate law enforcement purposes.. In this case, Hagan had been lawfully arrested, based upon probable cause, and was in the legitimate custody of the Portsmouth police. It was only while acting in accordance with their duty to gather and preserve evidence for use at trial, that the officers drove Hagan to Middletown for a Breathalyzer test. We are thus satisfied that the Portsmouth police acted appropriately and did not relinquish lawful custody of their prisoner at the town line. This conclusion rests upon the distinction between an arrest and seizure of a suspect outside a municipality's borders—an authority that is limited in scope and recognized only in narrowly-defined circumstances—and the extraterritorial transport of a prisoner who is in lawful custody, for the performance of legitimate law enforcement duties, which we sanction today.
>
> . . . .
>
> Although well-reasoned, the Superior Court decision in *Marran* is not binding upon this Court and we decline to follow it.· As a matter of public policy, whether an officer's responsibilities include an extraterritorial transport for access to a blood-alcohol testing machine or any other duty in connection with an arrestee who is in lawful custody, we decline to handcuff the state's law enforcement officials in the performance of their legitimate duties. Most notably under the circumstances now before us, in which the officer acted in apparent good faith, upon consent, and in light of the urgency

of obtaining blood alcohol evidence before it is metabolized in the blood, we are satisfied that Sullivan acted pursuant to his lawful authority.

819 A.2d at 1260–61. We cite with approval the reasoning employed by the Rhode Island ⌊14Supreme Court in *Hagan* and hold that Deputy Harris's actions in the present case were both reasonable and lawful. Thus, we affirm the denial of the motion to suppress.

Affirmed.