2013 Ark. 264

Kathy LIVINGSTON, Appellant

v.

STATE of Arkansas, Appellee.

No. CR–12–945.

Supreme Court of Arkansas.

June 20, 2013.

Files & Brasuell by: Toney B. Brasuell, for appellant.

Dustin McDaniel, Att'y Gen., by: Jake H. Jones, Ass't Att'y Gen., for appellee.

CLIFF HOOFMAN, Justice.

Appellant Kathy Livingston appeals from her conviction for first-degree murder, for which she received a sentence of life imprisonment. On appeal, appellant argues that the circuit court erred (1) in failing to grant her motion to suppress physical evidence and (2) in denying her motion for a mistrial after her trial counsel's father died during the trial. Our jurisdiction is pursuant to Ark. Sup.Ct. R. 1–2(a)(2) (2012). We affirm.

Appellant was charged with capital murder in connection with the death of her husband, Bobby Livingston, on June 18, 2011. According to the evidence presented at trial, Dawn Sims, appellant's daughter who lived across the street from the Livingstons in Lake Village, Arkansas, received a phone call from appellant at approximately 6:45 p.m. on June 18. Sims testified that appellant was intoxicated and that she stated, "Dawn, I shot Bobby. He's dead." Sims ran to appellant's home and found her outside on the patio. Appellant yelled at Sims not to go inside the house, but Sims ignored her and went into the kitchen, where she found Bobby naked and lying on the floor in a pool of blood. Sims stated that Bobby did not appear to be alive. When appellant

walked back into the kitchen, Sims noticed that appellant was also naked and covered in blood. Sims attempted to call 911, but appellant tried to stop her by wrestling the phone away. Sims struggled with appellant and pushed her out into the carport, locking the door. While Sims was on the phone with the 911 dispatcher, appellant came back into the house through another door carrying a gun. Sims was afraid that appellant would hurt her and ran out of the house. Appellant followed her and, according to Sims, mouthed to her that she was not going to hurt Sims but was instead going to hurt herself. Appellant walked back into the kitchen, and through the glass door, Sims witnessed her mother sit down on the floor next to Bobby and shoot herself in the chest. Sims attempted to apply pressure to appellant's wound but appellant resisted, complaining that Sims was hurting her. Sims called 911 a second time to report that her mother had shot herself. Shortly afterward, the police and medical personnel arrived, and appellant was taken to the hospital. Appellant survived her self-inflicted gunshot wound, but Bobby was deceased when the paramedics arrived.

Lake Village Police Officers Mike Pitts and Cole Rice received the 911 dispatch concerning the shooting at the Livingston home and arrived on the scene at 6:52 p.m. They discovered Sims sitting outside on the driveway, with her face, neck, and arms covered in blood. Sims told the officers that appellant had shot Bobby and responded affirmatively when they asked if appellant was still in the house with the weapon. The officers went through the carport door into the kitchen and immediately saw both appellant and Bobby lying on the floor. Officer Pitts initially thought that both persons were deceased but then saw appellant take a deep breath. He also noticed that the weapon was underneath appellant's leg. The officers backed out of the residence to wait on the paramedics and to avoid contaminating the scene.

Captain Bob Graham and Arkansas State Police Investigator Scott Woodward were summoned to the scene, and they prepared an affidavit for a search warrant for the residence. The affidavit recited that the victim had been shot in the chest and killed by appellant at approximately 6:51 p.m. and that appellant had been taken to the hospital with a gunshot wound to the chest. The warrant was issued by the Chicot County District Judge at 8:44 p.m., and the search of the home began at 8:49 p.m. From the living room area, the police collected blood samples found on the living room door, patio steps, recliner, and victim's pants; a 9mm shell casing matching the weapon found at the scene; and one bullet. From the kitchen, police recovered blood samples and human tissue from the floor, sink, and wall; the 9mm handgun, which contained a spent shell casing; and another 9mm shell casing from the floor. Several days later, on June 21, 2011, another search warrant was issued, and additional evidence was collected from the kitchen after appellant's father contacted the police and informed them that, while cleaning, another bullet was discovered lodged in the kitchen floor.

Prior to trial, appellant filed a motion to suppress the evidence found pursuant to the first search warrant, primarily arguing that there was no justification or authorization for a nighttime search contained in the affidavit or search warrant and that the officers' reentry into the Livingstons' home on the night of June 18, 2011, was therefore illegal. At the hearing on the motion to suppress, Officer Pitts testified that he and Officer Rice did not search the residence or seize any evidence when they responded to the 911 call from the residence. Pitts stated that they went only

briefly into the kitchen to determine the status of the victim and the appellant, then went back outside to wait for the paramedics and the other officers. When Captain Graham arrived on the scene, just prior to the ambulance's arrival, he instructed Pitts to take photographs of appellant and the victim before they were removed by the paramedics. Graham testified that, after the paramedics had left and the scene was secure, he and Investigator Woodward prepared the affidavit for the search warrant while sitting outside the residence. The warrant was issued at 8:44 p.m., and Woodward testified that he did not check any of the boxes to authorize a nighttime search warrant in his affidavit, nor did he indicate that there was probable cause for a nighttime warrant.

After the hearing, the circuit court took the motion to suppress under advisement pending posthearing briefs by both parties. In her brief, appellant challenged only the evidence from the living room and patio area of the residence because these items were seized pursuant to the warrant and were not in view during the officers' initial warrantless entry into the kitchen, which was justified by exigent circumstances. The circuit court denied the motion to suppress by written order entered on July 16, 2012. The court found that, even if the nighttime search warrant was invalid, the evidence should not be suppressed because it would have inevitably been discovered pursuant to the second search warrant, which was valid. The court noted that Bobby Livingston's father had been cleaning the residence when he noticed the bullet lodged in the kitchen floor and notified the police. The court stated, "Since blood was also found in the living room, it is no stretch of the imagination to conclude that in cleaning he would have found the items earlier located in the living room had the police not seized them with the first search warrant, [and] notified the police,

who would have secured a valid search warrant for their seizure." Thus, the court ruled that the evidence from the living room and patio would not be suppressed.

At the trial, the crime lab personnel testified that all of the blood and tissue samples collected matched Bobby's DNA, with the exception of the sample from the living room door, which contained DNA from more than one person, with Bobby being the major contributor. Charles Paul Kokes, the chief medical examiner, testified that Bobby sustained two gunshot wounds, one to the hand and one to the chest. Kokes stated that the chest wound was sustained while the handgun was in direct contact with the chest and that this shot went through Bobby's heart, causing his death. From analyzing the evidence, Woodward determined that Bobby was shot in his hand while sitting in the recliner in the living room and that he then went into the kitchen, where he held his hand over the sink, resulting in vertical blood spatter. Investigator David Tumey testified that Bobby was shot a second time in the chest while standing up next to the sink, as evidenced by his tissue found near the sink area and the bullet hole found in the tile backsplash. Tumey stated that the bullet found in the kitchen floor came from appellant's self-inflicted gunshot wound to her chest.

At the conclusion of the trial, the jury was instructed on the charged offense of capital murder, as well as the lesser-included offenses of first-degree murder, second-degree murder, and manslaughter. The jury convicted appellant of first-degree murder and sentenced her to life in prison. Appellant filed a timely notice of appeal from the judgment and commitment order entered on September 14, 2012.

In her first point on appeal, appellant challenges the circuit court's denial of her motion to suppress. When reviewing a trial court's denial of a motion to suppress evidence, the appellate court conducts a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to the inferences drawn by the trial court. *Pickering v. State*, 2012 Ark. 280, 412 S.W.3d 143. A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Id.* We defer to the trial court's superior position in determining the credibility of the witnesses and resolving any conflicts in the testimony. *Id.*

Appellant argues, as she did to the circuit court, that the evidence seized from the living room and patio pursuant to the first search warrant should be suppressed because the affidavit in support of the warrant did not contain justification for a nighttime search under Arkansas Rule of Criminal Procedure 13.2(c), and the judicial officer did not authorize a nighttime search. Appellant concedes that there were exigent circumstances to justify the officers' initial entry into the kitchen to secure the murder scene; however, appellant contends that once the scene has been secured, the officers had no right to enter or search the residence in the absence of a valid warrant. *See Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997) (holding that a search following an emergency entry will be upheld only if the search is reasonably necessary for the prevention of death, bodily harm, or destruction and is strictly circumscribed by the exigencies that necessitated the emergency in the first place).

Pursuant to Ark. R.Crim. P. 13.2(c) (2012), a judicial officer may issue a search warrant to be executed between the hours of 8 p.m. and 6 a.m. only if he or she has reasonable cause to believe that (i) the place to be searched is difficult of speedy access, or (ii) the objects to be seized are in danger of imminent removal, or (iii) the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy. This court has invalidated nighttime search warrants where the evidence presented in support of the nighttime search lacked sufficient factual information to support one or more of these exigent circumstances. *See, e.g., Fouse v. State*, 337 Ark. 13, 989 S.W.2d 146 (1999); *Garner v. State*, 307 Ark. 353, 820 S.W.2d 446 (1991).

In this case, the first search warrant was executed after 8 p.m., and the State does not dispute that police violated the requirement in Rule 13.2(c) that they obtain a nighttime search warrant. However, the State contends that under Ark. R.Crim. P. 16.2(e) (2012), a motion to suppress should be granted only if the court finds that the violation upon which it is based is substantial or if it is otherwise required by the Constitution of the United States or of this state. After analyzing the factors contained in Rule 16.2(e), the State argues that the unauthorized nighttime search was not a substantial violation under the circumstances in this case. In addition, the State agrees with the circuit court's finding that under Rule 16.2(e)(vi), the evidence from the living room of appellant's residence would have been inevitably discovered pursuant to a valid search warrant, in much the same manner as the bullet that was discovered lodged in the kitchen floor several days later. Further, the State contends that appellant cannot demonstrate prejudice from the seizure of

the evidence from the living room, given all the other evidence that was properly admitted, and asserts that the circuit court's ruling can be affirmed under the harmless-error doctrine.

■■■ We agree with the State that the admission of evidence from the living room and the patio is harmless error under the facts in this case; therefore, there is no need to address whether the violation was substantial or whether the circuit court properly applied the inevitable-discovery doctrine. The denial of a motion to suppress can be harmless error when the evidence of guilt is overwhelming and the error is slight, or this court concludes beyond a reasonable doubt that the error did not contribute to the verdict. *Criddle v. State*, 338 Ark. 744, 1 S.W.3d 436 (1999); *Abdullah v. State*, 301 Ark. 235, 783 S.W.2d 58 (1990). To apply this doctrine, the appellate court must excise the improper evidence and examine the remaining evidence. *Criddle, supra.*

As the State asserts, even if the evidence from the living room and patio had been excluded, there remains ample evidence to sustain appellant's conviction for first-degree murder, which required the State to show that the defendant, with the purpose of causing the death of another person, caused the death of another person. Ark.Code Ann. § 5–10–102(a)(2) (Repl.2006). A person acts purposely with respect to his or her conduct when he or she acts with the conscious object to engage in conduct of that nature or to cause the result thereof. Ark.Code Ann. § 5–2–202(1) (Repl.2006).

Here, appellant told her daughter, Sims, that she had shot and killed the victim. Sims also saw appellant with the pistol, and it was determined that the two empty shell casings from in the kitchen were fired from the only pistol recovered from the scene. Appellant argues that without the evidence complained of, the State would not have been able to prove its theory that appellant shot the victim in a premeditated or purposeful manner by shooting him once in the living room and then by following him into the kitchen, where she shot him a second time. We disagree. The medical examiner testified that the victim had two gunshot wounds, one in his hand and one at point-blank range to his chest. Because only two projectiles were found in the kitchen, one of which resulted from appellant's self-inflicted gunshot wound, the jury could infer that appellant shot the victim in another room and then fired the second gunshot in the kitchen. Further, the vertical blood spatter and other evidence showed that the victim stood over the sink with his hand wound and was then shot in the chest while standing in that area. Most notably, this second gunshot wound occurred when the handgun was pressed directly against the victim's chest, and the bullet penetrated his heart. We have held that in a first-degree murder case, the defendant's intent may be inferred from the nature, extent, and location of the victim's wounds. *James v. State*, 2010 Ark. 486, 372 S.W.3d 800.

Given these facts, we find that there was overwhelming evidence to support appellant's conviction for first-degree murder and that any error resulting from the admission of evidence from the living room and patio was slight. We therefore affirm on this point.

■■■ In her second point on appeal, appellant argues that the circuit court erred by denying her motion for mistrial when defense counsel's father died on the eve of the second day of trial. It is well settled that a mistrial is a drastic remedy and is to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial. *Zacha-*

*ry v. State*, 358 Ark. 174, 188 S.W.3d 917 (2004). The determination of whether to grant a mistrial is within the sound discretion of the trial court, and the decision will not be reversed absent a showing of abuse or manifest prejudice to the appellant. *Id.*

Appellant's counsel notified the circuit court on the morning of the second day of trial that his father had died, and he asked for a mistrial, stating that he considered himself ineffective to try the case that day. The court stated that it was reluctant to grant a mistrial because the prosecution and the jury had already spent a great deal of time preparing for the case and hearing evidence. The State argued that a continuance for a week would be sufficient for defense counsel to conclude his arrangements and return to complete the trial. The circuit court then asked both parties if they would be able to continue the case until the following week. The State agreed to this arrangement, and defense counsel stated that his only issues were whether he could take care of the funeral arrangements before then, whether the witnesses would remain under subpoena, and whether the jury might be prejudiced by outside influences during the suspension of the trial. The court gave defense counsel the opportunity to take one witness's testimony in the event that she could not return and also agreed to give the jury a cautionary instruction that they should not read about or discuss the case during their absence. Defense counsel did not further object to the continuance, and when the trial was resumed the following week, the court, on counsel's request, questioned the jury to ensure that they had not been prejudiced during the continuance. The jury did not bring anything to the court's attention during this questioning.

Under these circumstances, the trial court did not abuse its discretion in denying the motion for a mistrial. The court balanced the need for defense counsel to make arrangements and to process his situation with the interests of the prosecution, the witnesses who had testified, and the jury in continuing the case. In addition, appellant's concern about possible outside influences on the jury was addressed by the circuit court, both through its cautionary instruction and its questions to the jury when the trial resumed. We therefore affirm on this point as well.

In compliance with Ark. Sup.Ct. R. 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found.

Affirmed.