Cite as 2025 Ark. 128

# SUPREME COURT OF ARKANSAS
**No.** CR-24-517

| | | |
|---|---|---|
| TIMOTHY CLEVENGER | | **Opinion Delivered:** September 11, 2025 |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CR-18-4503] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE LEON JOHNSON, JUDGE |
| | APPELLEE | <u>AFFIRMED</u>. |

**CODY HILAND, Associate Justice**

Timothy Clevenger appeals his Pulaski County Circuit Court conviction for first-degree murder. On appeal, he argues that (1) the evidence was insufficient to support his conviction; (2) the circuit court erred in denying his motion to suppress evidence obtained under a search warrant; (3) the circuit court erred in admitting certain evidence; and (4) the circuit court erred in admitting certain witness testimony. As his arguments are without merit or are improperly preserved, we affirm.

## I. *Factual and Procedural Background*

At 8:08 a.m. on September 3, 2018, Timothy Clevenger called 911 to report that his wife, Margaret, was unresponsive and covered in blood in the hallway of their home. Three officers responded and found Clevenger performing CPR on Margaret under the direction of dispatch. One officer took over CPR while the others secured the scene. Margaret's body was cold, pulseless, and surrounded by extensive blood, as noted by all three officers.

EMS arrived shortly thereafter, confirmed that she had no vital signs, and transported her to Baptist Hospital in Little Rock, where she was pronounced dead.

Margaret's injuries were consistent with a violent assault. She had bruising on her arms, a defensive cut on her left hand, and strands of her own hair clutched in her right hand. Her face was bruised and lacerated, consistent with multiple blows or impacts against a hard surface. She sustained three major blunt-force injuries to her skull, fracturing bones near its base. The blows tore the protective membrane around her brain and caused intercranial bleeding. The medical examiner concluded that Margaret died from multiple blunt-force head injuries.

At the scene, Clevenger was wearing a white, bloodstained undershirt, shorts, and sneakers. Bloody handprints appeared on the lower back of his shirt, consistent with one grasping him during an assault. His socks and legs were bloodstained, and his shoes were spattered with blood. His hands bore fresh cuts, and his knuckles were swollen. Officers observed no signs of forced entry into the home and no missing valuables.

Officers also observed blood throughout the living room and the hallway, in the laundry room, on the walls, and on the furniture. Blood was also found on the fireplace, sink-light switch, hand towels, and even on the washing machine. DNA testing confirmed that nearly all of the blood belonged to Margaret, except for a small amount of Clevenger's blood on the master bedroom door handle. Detectives later testified that the assault likely began in the living room and continued into the hallway and that someone attempted to clean parts of the scene before police arrived.

When EMS arrived, Clevenger claimed he was hyperventilating and might "throw up." Officers initially believed he was having a panic attack and transported him to the

hospital. They later concluded that he had feigned symptoms, noting he would "act out" while being examined but return to a state of calmness when left alone. He was released later that day and interviewed by detectives.

During his custodial interview, Clevenger emphasized his seldom-deviated-from daily routines. He stated that he left for the gym promptly at 7:00 a.m. wearing the same undershirt later collected by police and that he returned home at 8:00 a.m. to discover Margaret. Video evidence contradicted his account. Gym security footage showed him arriving at 7:22 a.m. and leaving at 8:00 a.m. A neighbor's security camera captured him taking an unusual, circuitous route to the gym that morning. Clevenger also claimed he let the family dog out immediately upon returning home; however, detectives noted the absence of bloody pawprints or blood on the dog—despite testimony that the dog ordinarily stayed by Margaret's side.

The investigation further revealed several possible motives. Clevenger informed detectives that his marriage to Margaret had deteriorated as they were no longer intimate, slept in separate bedrooms, and attended separate churches. The couple also faced significant financial strain, including expensive home renovations, their daughter's wedding expenses, a new car for Margaret, and substantial credit card debt. Margaret had also lost her job earlier that year. Detectives later learned that Clevenger was the sole beneficiary of a $250,000 life insurance policy on Margaret.

On November 21, 2018, Clevenger was charged with first-degree murder. According to the State, when officers attempted to arrest at his daughter's home, Clevenger fled and was later found hiding in Margaret's vehicle at their home.

Prior to trial, Clevenger moved to suppress the evidence seized from his home. The detectives obtained a search warrant at 10:15 a.m. on the morning of the murder, relying on his 911 call, the condition and nature of the scene, and information from their initial canvass. The search began at 11:21 a.m. and continued over four days. Forensic officers photographed the residence, collected blood samples, field-tested stains, and secured the home each night to prevent tampering or contamination.

At the suppression hearing, Clevenger argued that the district judge who approved the warrant abandoned his role as a neutral magistrate by issuing it within two minutes. He further contended that the search violated Arkansas Rule of Criminal Procedure 13.2(c), pointing specifically to the detectives' after-hours work past 8:00 p.m. without an express nighttime authorization. He claimed all evidence obtained during those periods should have been suppressed. The State responded that the warrant was amply supported by probable cause and that the approving judge's prompt issuance did not compromise his neutrality. It argued that the after-hours search was either permissible under *Moore v. State*, 297 Ark. 296, 761 S.W.2d 894 (1984), or, at worst, a technical irregularity not requiring suppression under Arkansas Rule of Criminal Procedure 16.2(e).

The circuit court denied Clevenger's motion, finding no evidence of judicial bias on the part of the approving judge. It ruled that the first day's after-hours search fell within the *Moore* exception, and that the remaining late-night work was insubstantial, with the evidence inevitably discoverable during the next day's search.

At trial, Clevenger objected to testimony describing stains that had field-tested positive for blood. The circuit court granted his motion in limine, limiting witnesses to referring to "stains" unless confirmatory testing established the presence of blood. Later,

4

however, crime-scene specialist—and State lay witness—Megan Buchert testified about apparent transfer and spatter stains on Clevenger's clothing and shoes and throughout the scene. Clevenger objected once, and the circuit court ruled that Ms. Buchert could use the term "stain" only in reference to what she had witnessed at the scene and in the crime-scene photographs in light of this court's holding in *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993).

Through the Clevenger's daughter, the State also introduced family photographs depicting candlesticks on the living room mantle. Clevenger objected on grounds dissimilar to his argument on appeal, and the court overruled the objection. Medical examiner Dr. Frank Peretti testified that Margaret's injuries were consistent with blows from a heavy object of that type. The following day, Clevenger objected to Dr. Peretti's testimony and argued that, in discovery, the State had failed to disclose candlesticks as a potential murder-weapon theory. The court rejected his argument, noting that the photographs had been provided in due course of discovery and that, when cross-examined by Clevenger, Dr. Peretti acknowledged the injuries could have been caused by various objects.

Clevenger's sole argument was to shift blame to his son, citing a statement he made at an Alcoholics Anonymous meeting after the murder. Clevenger's son testified that his remark had been figurative and misinterpreted and denied any involvement in his mother's death. The jury rejected Clevenger's defense and convicted him of first-degree murder. He was sentenced to life imprisonment. This appeal followed.

## II. *Law and Analysis*

### A. Sufficiency of the Evidence

Although Clevenger raises his sufficiency-of-the-evidence challenge last, we address it first in accordance with double-jeopardy principles. *Bush v. State*, 2024 Ark. 77, at 5, 687 S.W.3d 570, 573. Clevenger argues that the circuit court erred in denying his motion for directed verdict because the evidence of his guilt was "scant and below the due process minimum required to send the case to the jury." We disagree. Substantial evidence supports affirming Clevenger's conviction and life sentence for first-degree murder.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Parker v. State*, 2025 Ark. 55, at 4, 709 S.W.3d 807, 811. When reviewing the appellant's challenge, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.*, 709 S.W.3d at 811. Accordingly, we will affirm the verdict if substantial evidence supports it. *Id.*, 709 S.W.3d at 811. Substantial evidence is evidence of a sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.*, 709 S.W.3d at 811. Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Oliger v. State*, 2025 Ark. 8, at 5, 704 S.W.3d 305, 308; *Nelson v. State*, 2024 Ark. 24, at 5, 683 S.W.3d 177, 185.

Furthermore, in resolving conflicting testimony and inconsistent evidence, it is the jury's role to assess witness credibility and resolve discrepancies in the evidence. *Parker*, 2025 Ark. 55, at 4–5, 709 S.W.3d at 811. The jury is entitled to accept the State's version of the facts over the defendant's, resolve any inconsistent testimony, and accept or reject

6

any alternative theories. *Id.* at 4, 709 S.W.3d at 811. Lastly, the jury can consider evidence of the accused's flight to avoid arrest as probative of their guilt. *Smith v. State*, 2025 Ark. 26, at 20, 708 S.W.3d 336, 350.

At trial, the State bore the burden of proving that Clevenger, with the "purpose of causing the death of another person," caused the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2013). Clevenger simply argues that he was not Margaret's murderer. The record, however, contains substantial evidence to the contrary. Margaret was brutally beaten—sustaining facial bruising, defensive wounds, and skull fractures consistent with blunt-force trauma. Clevenger's own hands were cut, bruised, and swollen, which are injuries consistent with repeatedly striking a person or an object. The jury was entitled to connect Margaret's fatal injuries with his. Although the State was not required to produce a murder weapon, it introduced photographs of candlesticks in the Clevenger home and medical testimony that such an object could have caused the fatal injuries. From this, the jury could reasonably infer that Clevenger used a blunt household object—such as one of the missing candlesticks—to violently murder his wife.

The jury was also entitled to consider the veracity of Clevenger's statements. He claimed to have left for the gym at 7:00 a.m. wearing the same undershirt later recovered by police, yet video footage showed him arriving at 7:22 a.m. in a different shirt that was never recovered. He also misrepresented his route to the gym, a claim contradicted by a neighbor's home security footage. The jury could further weigh his prior statements about letting out the family dog—an explanation unsupported by the absence of bloody pawprints in the house or blood on the pet itself. Likewise, his feigned panic attack at the crime scene could reasonably be viewed as evidence of consciousness of guilt. The jury could further

7

infer guilt from evidence suggesting a cleanup effort: blood found in the kitchen sink, on a light switch, on hand towels, and on the washing machine. And the jury could consider motive evidence, including the Clevenger's failing marriage, the lack of intimacy between him and his wife, their mutual financial strain, and the $250,000 life insurance policy on Margaret—of which he was the sole beneficiary. Finally, the jury could consider his attempt to avoid arrest, which is probative of guilt.

Viewing the evidence in its entirety, the jury concluded that Clevenger's guilt was proved beyond a reasonable doubt, resolving any potential inconsistencies in the testimony, and found Clevenger guilty of first-degree murder. Therefore, substantial evidence existed at trial for the circuit court to properly deny Clevenger's motion for directed verdict, and it therefore did not err.

### B. Motion to Suppress

Clevenger's second claim on appeal consists of three separate challenges, which relate to the validity of the search and the denial of his motion to suppress evidence obtained under the search. First, he argues that the district judge who approved the search warrant was not neutral and detached, requiring suppression of the evidence obtained under the warrant. Second, he contends that certain searches conducted pursuant to the warrant were unauthorized nighttime searches in violation of Arkansas Rule of Criminal Procedure 13.2(c). Third, he asserts that the overall duration of the search was unconstitutional. We reject his first two arguments. His third claim was not preserved for appellate review, and therefore, we do not address it.

In reviewing a circuit court's denial of a motion to suppress, we make an independent examination of the issue based on the totality of the circumstances. *Scarbrough v. State*, 2024

8

Ark. 71, at 12, 687 S.W.3d 557, 565; *King v. State*, 2019 Ark. 114, at 5, 571 S.W.3d 476, 479. We give due weight to the inferences drawn by the circuit court and proper deference to its findings as it sits in a superior position to evaluate the credibility of witnesses at a suppression hearing. *Scarbrough*, 2024 Ark. 71, at 12, 687 S.W.3d at 565. We also view the evidence in the light most favorable to the State. *King*, 2019 Ark. 114, at 5, 571 S.W.3d at 479. We will reverse a denial of a motion to suppress only if the ruling is clearly against the preponderance of the evidence. *Nelson v. State*, 2025 Ark. 22, at 4, 705 S.W.3d 876, 879; *Scarbrough*, 2024 Ark. 71, at 12, 687 S.W.3d at 565; *King*, 2019 Ark. 114, at 6, 571 S.W.3d at 479. A factual finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire record, is left with the definite and firm conviction that a mistake was made. *White v. State*, 2024 Ark. 11, at 2, 682 S.W.3d 7, 9.

### 1. *Neutral and detached*

The United States and Arkansas Constitutions both provide that no warrant shall issue except upon probable cause, supported by an oath or affirmation. *See* U.S. Const. amend. IV; *see also* Ark. Const. art. 2, § 15. Reviewing courts give "great deference" to a judge's determination of probable cause. *United States v. Leon*, 468 U.S. 897, 913–14 (1984). Whether sufficient facts support such a finding must be determined by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). In *Leon*, the Court emphasized that a judge must act independently and not serve as a mere "rubber stamp" for the police. 468 U.S. at 914. Clevenger contends that the approving district judge did just that. We disagree.

A prudent judge must make a "practical, common sense" determination as to whether the search warrant application provides a "substantial basis" for finding probable

cause. *Yancey v. State*, 345 Ark. 103, 111, 44 S.W.3d 315, 320 (2001). Facts may be established by direct or circumstantial evidence, so long as the application supports the inferences drawn. *Id.*, 44 S.W.3d at 320. We have also emphasized that search warrant applications "'should speak in factual and not merely conclusory language,'" because "'[i]t is the function of the judicial officer . . . to make an *independent and neutral determination based upon facts*, not conclusions, justifying an intrusion into one's home.'" *Kelley v. State*, 371 Ark. 599, 605, 269 S.W.3d 326, 330 (2007) (emphasis added) (quoting *State v. Broadway*, 269 Ark. 215, 218, 599 S.W.2d 721, 723 (1980)). Under the test articulated in *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004), an approving judge must decide, based on the totality of the circumstances, whether there is a fair chance that evidence of a crime will be found at a particular place; our review is limited to ensuring the magistrate had a substantial basis for so concluding. *George v. State*, 358 Ark. 269, 283, 189 S.W.3d 28, 36 (2004).

Clevenger argues that the two minutes the approving judge spent reviewing the warrant application were insufficient for meaningful consideration. However, nothing in the record persuades us that the approving judge failed to act neutrally or independently or lacked a substantial basis for finding probable cause. As the State notes, an experienced judge can prudently review a succinct, factually detailed application in a short time. Here, the application recounted (1) Clevenger's 911 call reporting his wife unresponsive and covered in blood, and his CPR efforts; (2) the officers' observation of blood throughout the home and Margaret's subsequent death; (3) discrepancies in Clevenger's statements; (4) Clevenger's transport to the hospital for evaluation; and (5) the request to search the Clevenger residence, curtilage, vehicles, and structures and collect forensic evidence. These

factual assertions, whether circumstantial or direct, established a substantial basis for the conclusion that evidence would be found in the home, *which was the scene of the crime.*

The process was not rushed. The investigator alerted the district judge in advance that an application was forthcoming and e-mailed the application and a template warrant at 10:13 a.m. At 10:15 a.m., the judge returned the approved warrant. Given the advance notice, the straightforward nature of the application, and the judge's experience, the two-minute turnaround does not indicate bias or abandonment of judicial duty. Rather, it reflects the "fair probability" determination on which "reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013).

Though brief, the review period here does not leave us with the firm conviction that an error occurred. Considering the totality of the circumstances, we conclude the warrant was properly issued. Accordingly, we find no error in the circuit court's decision to deny Clevenger's motion to suppress on this point.

## 2. *Unauthorized nighttime searches*

Clevenger next contends that the evidence seized pursuant to the search warrant should be excluded because the warrant did not authorize a nighttime search and a nighttime search was nevertheless conducted. We disagree.

Clevenger is correct that the warrant contained no authorization for a nighttime search and that illegal nighttime searches are "typically substantial violations" of the Arkansas Rules of Criminal Procedure. *See* Ark. R. Crim. P. 13.2(c); *Richardson v. State*, 314 Ark. 512, 517, 863 S.W.2d 572, 575 (1993) (issuance of nighttime warrant at issue where the search was executed—*or began*—at approximately 8:45 p.m. and continued until midnight); *State v. Martinez*, 306 Ark. 353, 356, 811 S.W.2d 319, 321 (1991) (issuance of nighttime

warrant at issue where search began at 9:00 p.m. and continued for nineteen hours, constituting a substantial violation of Rule 13.2(c)); *Hall v. State*, 302 Ark. 341, 342–43, 789 S.W.2d 456, 457–58 (1990) (nighttime warrant was unnecessary and should not have been issued). But the facts of this case do not square with our precedent. First, no nighttime warrant was issued, and second, no nighttime search occurred.

We have consistently held that "as long as a search is begun before 8:00 p.m. and is concluded as soon thereafter as feasible, the search does not violate the ban against nighttime searches." *Brenk v. State*, 311 Ark. 579, 590, 847 S.W.2d 1, 7 (1993); *see also Richardson*, 314 Ark. at 517, 863 S.W.2d at 575 ("We refer to searches which occur after 8 p.m. as 'nighttime' searches in our case law. The search warrant at issue was executed at approximately 8:45 p.m. and the search continued until around midnight."); *Brothers v. State*, 261 Ark. 64, 67, 546 S.W.2d 715, 717 (1977) ("The record reflects the search was started about 8 p.m. and completed as soon thereafter as possible. We do not find this to be a material violation of Rule 13.2(c) . . . ."). Further, when law enforcement secures a scene overnight to ensure that it remains undisturbed, the resulting search is deemed a single, continuous search. *Moore v. State*, 244 Ark. 1197, 1201, 429 S.W.2d 122, 126 (1968).

No violation of Rule 13.2(c) occurred in the first instance. As the State correctly notes, none of the searches pursuant to the warrant began anywhere near the 8:00 p.m. cutoff. The four start times were 11:21 a.m., 10:35 a.m., 9:35 a.m., and 9:34 a.m., respectively, across the four-day search. Here, the warrant was commenced between 6:00 a.m. and 8:00 p.m., as Rule 13.2(c) requires. *See Livingston v. State*, 2013 Ark. 264, at 7, 428 S.W.3d 474, 478 ("In this case, the first search warrant was executed after 8 p.m. . . . ."); *State v. Tyson*, 2012 Ark. 107, at 2, 388 S.W.3d 1, 3 ("Detective Harbor immediately

12

typed up a search warrant and included a nighttime clause because it would be after 8:00 p.m. when the search was executed."); *Richardson*, 314 Ark. at 517, 863 S.W.2d at 575 ("The search warrant at issue was executed at approximately 8:45 p.m. . . . ."); Ark. R. Crim. P. 13.2(c) ("[T]he search warrant shall provide that it be executed between the hours of six a.m. and eight p.m. . . . ."). The fact that the search continued over consecutive days and extended past the 8:00 p.m. cutoff for an aggregate of four hours and nineteen minutes on two of the four days does not transform it into a nighttime search; when the forensic team was absent, an officer maintained watch to preserve the scene. Accordingly, we reach the same conclusion as the circuit court and find no error in its decision to deny Clevenger's motion to suppress on this point.

### 3. *Duration of the search*

Clevenger finally argues that the four-day search of his home was unconstitutional. This argument, however, is introduced for the first time on appeal. We have long held that an appellant "cannot raise issues, even constitutional ones, for the first time on appeal." *Kellensworth v. State*, 2021 Ark. 5, at 7 n.1, 614 S.W.3d 804, 809 n.1.

In his motions below, Clevenger argued that the warrant was unsupported by probable cause and was executed in a substantially unreasonable manner. He made no mention of the duration of the search in his motion to suppress. At the suppression hearing, Clevenger's trial counsel argued the "lack of particularity in the warrant," the "rubber stamping" by the approving judge, and the "blatant violation of the state procedural rule against nighttime searches in Arkansas." The sole reference to length was a single remark that the search amounted to a "four day free-for-all for the LRPD." This passing comment

13

does not preserve a challenge to the length of the search for appellate review. Thus, as this argument is not preserved, we will not address it.

## C. Admissibility of Evidence

Clevenger argues that the State's examination of two witnesses regarding the potential murder weapon violated Arkansas Rule of Criminal Procedure 17.1. His objection, however, came the following day—not contemporaneously—and he admitted as much at trial and on appeal. We have repeatedly held that "to preserve an issue [for] appeal, a defendant must object at the first opportunity." *Scarbrough*, 2024 Ark. 71, at 15, 687 S.W.3d at 566–67. Attempting to avoid this rule, Clevenger argues that his previous written motions and oral argument concerning discovery issues and the State's obligation to supplement discovery excused his duty to timely object. He offers no convincing argument or supporting authority for this proposition, and we decline to address it. *See Mann v. Pierce*, 2016 Ark. 418, at 8, 505 S.W.3d 150, 155.

Clevenger also argues, for the first time on appeal, that Dr. Peretti's expert testimony, which was offered in response to a hypothetical question about the murder weapon, was improper. As we have made clear, arguments made for the first time on appeal are barred. *Kellensworth*, 2021 Ark. 5, at 7 n.1, 614 S.W.3d at 809 n.1. Though he concedes that no contemporaneous objection was made, Clevenger now claims that his earlier objection to the introduction of photographs preserved the issue. This, too, is unsupported by a convincing argument or sufficient law or authority, and we will not consider it. *Mann*, 2016 Ark. 418, at 8, 505 S.W.3d at 155.

D. Admissibility of Witness Testimony

Clevenger raises two arguments concerning the testimony of crime-scene specialist Megan Buchert. First, he contends her testimony violated the circuit court's order in limine prohibiting the use of certain verbiage to describe bloodstains at the crime scene. Second, he asserts the circuit court erred by admitting multiple photographs during Ms. Buchert's testimony that were, in his view, needlessly cumulative under Rule 403 of the Arkansas Rules of Evidence and unduly prejudicial. His arguments are unpersuasive.

On the first point, Clevenger argues that the circuit court abused its discretion by failing to sua sponte prohibit Ms. Buchert from testifying about presumptive bloodstains and referring to them as "stains," "spatter," or "splatter." He contends that these terms violated the circuit court's ruling on his motion in limine,[1] which relied on this court's holding in *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993). Evidentiary rulings lie within the broad discretion of the circuit court, and we will not reverse absent a manifest abuse of discretion unless the defendant was prejudiced. *De la Garza v. State*, 2025 Ark. 10, at 8, 704 S.W.3d 627, 633; *Bragg v. State*, 2023 Ark. 66, at 7, 663 S.W.3d 375, 380; *Bishop v. State*, 2023 Ark. 150, at 10, 675 S.W.3d 869, 876. "Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration." *De la Garza*, 2025 Ark. 10, at 8, 704 S.W.3d at 633. And a violation of an evidentiary order by a party does not, by

---

[1]Prior to trial, Clevenger filed a motion in limine to prohibit the testimony of "apparent blood" and the introduction of blood-related evidence that was not scientifically tested at the state crime lab. Later, the circuit granted this motion and ruled that the State could only refer to non-scientifically tested blood evidence as a "stain," and specifically prohibited the use of the terms "possible blood" or "splatter."

itself, amount to an abuse of its discretion. *Harlan v. State*, 2024 Ark. 69, at 5 n.1, 686 S.W.3d 810, 813 n.1. Considering *Harlan*, as well as the analysis below, the circuit court did not abuse its discretion.

### 1. *Prohibited terms*

Below, the circuit court afforded Clevenger more protection than our precedent required when it evaluated Ms. Buchert's testimony through the lens of *Brenk*. *Brenk* does not control here for three reasons. First, the State did not attempt to introduce luminol testing results into evidence through Ms. Buchert's testimony. *See generally Brenk*, 311 Ark. at 590–95, 847 S.W.2d at 7–10. Second, *Brenk* applies exclusively to expert testimony concerning luminol results, and the State never qualified Ms. Buchert as an expert witness. *See generally id*. Third, *Dunn* clarifies that *Brenk* governs only when no confirmatory testing is performed; where confirmatory testing establishes the presence of human blood—as occurred here—evidence that a sample initially field-tested positive for blood is admissible. *See Dunn v. State*, 371 Ark. 140, 149–51, 264 S.W.3d 504, 510–11 (2007).

Although the circuit court relied on *Brenk* in its reasoning, it did so cautiously and in a manner that extended Clevenger greater protection than necessary under our case law. In fact, the circuit court and counsel for the parties discussed this issue for a considerable amount of time in open court and in bench conferences, and the circuit court recessed to solidify its stance. That exercise of caution reflects prudent and thoughtful consideration, and therefore, was not an abuse of discretion. Indeed, the circuit court's ruling benefited Clevenger rather than prejudiced him, and he cannot prevail on this claim.

16

## 2. *Violative photographs*

On the second point, Clevenger argues that the circuit court abused its discretion by admitting crime-scene photographs depicting what he characterizes as "presumptive blood." He contends, as he did below, that the photographs were needlessly cumulative, highly prejudicial, and lacking in probative value, and that their admission posed a significant risk of misleading or confusing the jury.

As stated above, evidentiary rulings—such as the admission of photographs—lie within the broad discretion of the circuit court, and we will not reverse absent a manifest abuse of discretion unless the defendant was prejudiced. *Haynie v. State*, 2025 Ark. 46, at 4, 709 S.W.3d 46, 48. Under Rule 403, relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, misleading the jury, or needless presentation of cumulative evidence. Ark. R. Evid. 403. We have long held that photographs, even those that may be graphic in nature, are admissible if they assist the jury in understanding witness testimony, depict the crime scene, or corroborate the State's theory of the case. *Haynie*, 2025 Ark. 46, at 4, 709 S.W.3d at 48; *Cone v. State*, 2022 Ark. 201, at 17, 654 S.W.3d 648, 660–61; *Williams v. State*, 2017 Ark. 287, at 8, 528 S.W.3d 839, 844. The State sought to introduce the photographs to illustrate the crime scene and support Ms. Buchert's forensic testimony. They were neither so numerous as to be cumulative nor so inflammatory as to outweigh their probative value. The circuit court therefore acted well within its broad discretion, and the admission of these photographs provides no basis for reversal.

III. *Conclusion*

In light of our well-set precedent governing sufficiency challenges, our de novo review of the circuit court's denial of the motion to suppress, and our review of the evidentiary rulings at issue, we conclude that Clevenger's arguments are without merit. His claims concerning the length of the search and the admissibility of certain evidence and testimony were not preserved for our review and are therefore not addressed. Accordingly, we affirm.

IV. *Rule 4-3(a) Review*

Because Clevenger received a life sentence, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to him in compliance with Arkansas Supreme Court Rule 4–3(a). No prejudicial error was found.

Affirmed.

*Brent P. Gasper*, Arkansas Public Defender Commission, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.