William E. (Pete) HAYNES *v.* STATE of Arkansas

CR 80-91                                    606 S.W. 2d 563
Supreme Court of Arkansas
Opinion delivered October 13, 1980
Rehearing denied November 24, 1980

E. Alvin Schay, State Appellate Defender, by: *Jackson Jones*, Deputy Defender, for appellant.

*Steve Clark*, Atty. Gen., by: *Mary Davies Scott*, Asst. Atty. Gen., for appellee.

JOHN I. PURTLE, Justice. Appellant was tried and convicted of first degree battery and aggravated assault with a firearm. The jury asssessed his punishment at 20 years on first degree battery and 10 years on aggravated assault with a firearm.

On appeal appellant urges four grounds for reversal: (1) the court erred in excluding veniremen who expressed reservations about assessing the combined maximum possible sentence to the offense charged; (2) the evidence was insufficient to support the verdict; (3) the court erred in failing to read AMCI 203 to the jury immediately following reference to a former felony conviction; and, (4) AMCI 301 as given was improper.

We find the evidence was sufficient to support the conviction. We also find appellant failed to timely request AMCI 203 and a correct version of AMCI 301. We must reverse, however, on the first argument.

During the trial, several witnesses testified that they saw the appellant draw the weapon and fire several shots. There was also undisputed proof that Henry Stone was struck by one of the bullets and suffered severe and permanently disabling injuries. Other witnesses testified that there was a truck driver named Shirley Smith in the restaurant and that one of the bullets penetrated her hat. Although Shirley Smith did not appear at the trial, several witnesses testified they saw a hole in her hat before the shooting and that there was no hole in it at the time. Thus, there clearly was sufficient evidence to support the conviction.

During an in-chambers hearing, the appellant's attorney obtained the agreement of the court to read AMCI 203 immediately following any questioning by the state about appellant's prior felony conviction. The state did in fact ask about the prior conviction, but the court failed to immediately read AMCI 203. However, the record does not show the appellant requested the instruction be read at that time. The instruction was eventually given along with all the other instructions at the close of the case.

AMCI 301 was given in a modified form as Instruction Nos. 11 and 19 to each of the charges. The pertinent portion of the instruction reads:

> If you have a reasonable doubt as to which offense the Defendant may be guilty of, you may find him guilty only of the lesser offense. If you have a reasonable doubt as to the Defendant's guilt of all offenses, you *may* find him not guilty. (Emphasis ours.)

The instruction should have been given in the following form:

> If you have a reasonable doubt as to which offense the Defendant may be guilty of, you may find him guilty

only of the lesser offense. If you have a reasonable doubt as to the Defendant's guilt of all offenses, you *must* find him not guilty. (Emphasis ours.)

There was no objection made to the instruction as given. It is obvious the word "may" was substituted for the word "must" in the last sentence of AMCI 301. On retrial the instruction should be given as set forth in AMCI 301 without modification.

We will now consider the argument that jurors were subjected to improper voir dire and those who expressed a reservation about the maximum combined punishment were improperly excused for cause. In an effort to assist in a better understanding of the opinion, we believe it will be helpful to set out some portions of the voir dire examination of the jury panel verbatim. During the prosecutor's examination he apparently sought to select a panel which would agree, in advance of the trial, to assess the maximum punishment if the appellant were found guilty. One remark made by the prosecuting attorney, during voir dire, regarding the assessment of punishment was:

\* \* \*

MR. LONG: Ladies and gentlemen, as the Court has told you, the charges here, one is battery in the first degree, and two, aggravated assault. Now, battery in the first degree is punishable — You will be instructed, I think, by not less than three nor more than twenty years in Arkansas Department of Corrections. Aggravated assault, you will be instructed is punishable by up to five years in the Arkansas Department of Corrections. In addition it is alleged in the information that the aggravated assault was committed with a firearm, and you will also be instructed that, I think, if a firearm is used in the commission of aggravated assault, that an additional fifteen years can be imposed. Now, what this all amounts to is that if the State proves the allegations of the information in its entirety, the maximum punishment that can be imposed will be twenty years in the Arkansas Department of Corrections for battery and fif-

teen plus five will be another twenty years in the Arkansas Department of Corrections for aggravated assault, ladies and gentlemen, that is serious and it is a very severe punishment, but I want to tell you right here and right now up front that that is what the State's going to be asking you to do, and that is to put Pete Haynes in the Arkansas Department of Corrections for forty years.

While prospective jurors Collins was being questioned, some of the questions and answers were as follows:

MR. LONG: As you sit there now, before you heard the facts, you feel regardless, that 40 years is just too much?

MRS. COLLINS: Well, yes, I do feel that way.

\* \* \*

JUROR: Well, if he's guilty of some of those things, will he get forty years, or lesser years, or could he get lesser years? Forty years is a long time out of a man's life. Did he kill someone? I don't know anything about the case.

THE COURT: Ask her again, Mr. Long.

BY MR. LONG:

Q. Mrs. Collins, that is what I am asking. No, he did not kill someone. Battery in the first degree is not killing. What I am asking and telling you is that I think the judge will instruct you that this man can receive up to forty years, and I understand that some of you — You may just feel like in any circumstances, regardless, that's too long. I am asking: As you sit there right now, are you thinking, regardless of what the State proves, that is just too long. I wouldn't impose that much. Maybe I could impose twenty but I just couldn't impose forty regardless of the facts. Is that the way you feel about it?

A. Well, I would have to hear the other side first.

Q. Well, that's not the way I'm asking. What I'm asking, Mrs. Collins —

A. I would try to be fair.

Q. Yes, I understand that. I know that, but here's the way I'm asking it to you. I'm asking: As you sit there right now, do you feel that for a battery and assault, that to put a man in the penitentiary for forty years is just too long regardless?

A. Well, yes, I do feel that way.

\* \* \*

Mrs. Collins was excused for cause.

The prosecuting attorney repeatedly asked prospective Jurors if they could fix punishment at 40 years. One such question was:

> \*\*\*Now with that in mind, assuming that we are able to prove his guilt beyond a reasonable doubt on both offenses, assuming we proved his guilt, we are satisfied of his guilt, would you be able to consider as the only possible punishment, would you be able to impose a sentence up to forty years in the Department of Corrections if the facts warranted it?

Not only was it error to excuse Mrs. Collins for cause, but we disapprove the kind of questions that the prosecutor asked the prospective jurors.

The purpose of selecting a jury is to obtain a panel which will be fair and impartial to the accused as well as the state. We recognize the severe and aggravating circumstances of this case, but there are limits beyond which the state may not proceed without resulting in prejudice to the accused.

The jury in this case was composed of 12 people who may have felt obligated in advance of hearing the evidence, to consider imposing the maximum punishment if the accused

were found guilty. They were not chosen upon their promise to consider the full range of penalties provided by law, as the court had correctly stated at one point earlier in the proceedings.

Although we do not agree with appellant that the Witherspoon doctrine is controlling here, we do adhere to the principle in *Witherspoon* v. *Illinois*, 391 U.S. 510, 522 n. 21 (1968), that both the state and the accused are entitled to an impartial and unbiased jury. In *Witherspoon* the question relates only to the penalty of death. It is proper in a capital case to determine if a prospective juror is irrevocably opposed to the death penalty regardless of the facts. If one juror so opposed to capital punishment were selected, it would effectively prohibit the death penalty in the case. A trial under such circumstances would be a useless and expensive exercise in futility. Countless people are opposed to capital punishment for any crime regardless of its nature, and it is a deeply emotional issue and in many cases is based upon religious beliefs and interpretations of the Bible. The question in capital cases is whether the juror would vote for the death penalty under any circumstances, not whether he considers the penalty excessive for the crime charged in the case before him.

There is usually no similar emotional feeling in regard to imprisonment for a certain number of years. No conscientious prospective juror should be required to say in advance of the trial whether he would consider the maximum penalty to be excessive. He should first be allowed to hear the testimony, observe the exhibits, hear the instructions by the court, and listen to the arguments of counsel. It is the duty of the jury to select the range of punishment it finds appropriate after hearing and observing the trial. Unless an impartial and unbiased jury is allowed to set the time a convicted felon shall serve, there is no need to require them to consider any question other than the guilt or innocence of the accused. The whole purpose of providing a variance in the time to be served by one convicted of a particular crime is to allow the jury to set the punishment at the number of years they feel is justified after hearing all the evidence in the case.

Mrs. Collins had been told the appellant had not killed anyone. Otherwise, she knew nothing about the case other than the charges against him which had been read to the panel by the court. She gave admirably impartial answers when she stated: "I would have to hear the other side first," and "I would try to be fair." This is precisely the type of answers a fair and impartial juror should be expected to give. However, her attitude was not acceptable to the state. Obviously, the state was attempting to obtain a jury which would agree, in advance of the trial, to inflict the maximum punishment if they found the accused guilty. A juror accepted for service after this type of questioning might understandably feel he was morally obligated to vote for the maximum sentence. Part of one frequent question put to the jury was, "If the facts warranted it," would the juror vote to impose the maximum sentence. This was a wholly meaningless statement to a juror who had not yet heard the facts. Although many of the questions by the prosecutor were proper, there were many others who were not. The whole line of questioning reveals the prosecutor intended to select a jury which would vote for the maximum sentnece upon a finding of guilt. Because of the basic unfairness of the type of questions presented to prospective jurors by the state, we hold that the questions clearly constituted prejudicial error.

There is another practical reason for prohibiting the tactics used in this case. If we approve the questions that were asked, and the ensuing challenge for cause, prosecutors will consider it their duty to qualify the jurors for the maximum punishment whenever the state intends to suggest it. The result would be endless bickering, as occurred here, about the jurors' answers to what are really unanswerable questions before the trial had been completed. Hundreds of prospective jurors will no doubt be needed before 12 are found who will be willing to promise, in advance of hearing the evidence, to impose the most severe sentence possible under the law. Not only would the trial process be greatly burdened and expanded in time and expense, but appeals would become commonplace. To allow such tactics might well be the straw that broke the camel's back.

Both the state and the defendant are entitled to a fair

and impartial jury, and the most that may be required of a juror, before the trial has begun, is that he be willing to consider all the penalties provided by law and that he not be irrevocably committed to vote against the possible penalties, regardless of the facts and circumstances that might ensue in the course of the trial.

Reversed and remanded.

FOGLEMAN, C.J., and HICKMAN, J., dissent.

DARRELL HICKMAN, Justice, dissenting. I disagree with the majority's decision which I interpret to mean that the State cannot successfully challenge a prospective juror who is committed before trial to voting against the maximum punishment even if warranted.

In my judgment, the majority opinion fails to evenly deal with the facts. First, the attorney prosecuting for the State quite properly made it clear from the beginning that he would challenge anyone who could not, under any circumstances, vote for the maximum punishment. An attorney representing the State is not denied that right in our advocacy system of law. In *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), the principle was laid down that the State may get 12 people who acknowledge in advance that they will, if warranted, give the death penalty; those who will not are excused because they are, in effect, biased against the State. The Court said in *Witherspoon* that the State is entitled to have a venireman who is ". . . willing to *consider* all the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts. . . ."

The State's attorney prefaced all of his questions with phrases such as, "Would you be able to impose it?"; "Can you consider sending him to the penitentiary for 40 years?"; ". . . and if the facts warranted it, could you return a verdict . . .?" ". . . if the facts warrant, could you impose a sentence up to 40 years . . .?" There was no attempt at all on the part of the State to be unfair in qualifying this jury.

Two prospective jurors were excused for cause. The trial judge found that these jurors were irrevocably opposed to maximum punishment.

Mrs. Collins, whose testimony is quoted in part in the majority opinion, finally concluded: "Well, yes, I do feel that way."

Mr. Banks, the other excused venireman who was challenged but whose testimony is not recited in the majority opinion, testified as follows:

Q. . . . The Defendant here is charged with battery in the first degree, and first degree is punishable up to twenty years in the Department of Corrections. He is also charged with aggravated assault with the use of a firearm. That is likewise punishable up to twenty years in the Department of Corrections. That's a total of forty years. That is a long time in a man's life, but because of the facts in this case, that's exactly the punishment the State is going to ask for, and the question I want to pose to you is this: Assume that after the evidence is in that you believe the State had proved the man's guilt beyond a reasonable doubt as we are required to do on both offenses, battery in the first degree and aggravated assault and at that point, the maximum possible punishment would be forty years upon the Defendant in the Department of Corrections.

A. *I could not.*

Q. What I'm asking you is this: If you believe he's guilty of both offenses beyond a reasonable doubt, you are convinced that in your mind, he's guilty, would you automatically refuse to consider a punishment of up to forty years as possible punishment? Would you just refuse to consider it?

A. *I couldn't give forty years.*

Q. Regardless of the facts and circumstances, you could not consider — even consider that?

A. *Not forty years.*

Q. Regardless of what the facts were?

A. *No.*

Q. Is that your answer?

A. *That's my answer.*

[Emphasis added.]

We have several cases where we have discussed the application of the *Witherspoon* rule. In *McCree* v. *State*, 266 Ark. 466, 585 S.W. 2d 938 (1979), we discussed the testimony of several prospective jurors who vacillated back and forth as they were questioned by the defense attorney and the State's attorney but, when finally questioned by the judge, said they could not vote for the death penalty. They were properly excused.

In *Hulsey* v. *State*, 268 Ark. 312, 595 S.W. 2d 934 (1980), we discussed another case where a juror equivocated repeatedly about her willingness to vote for or against the death penalty. Her final position as quoted in the *Hulsey* opinion, was as follows:

Q. Now, what I am trying to find out, even though you think he is guilty, would you automatically vote against the imposition of the death penalty would regard to any evidence that might develop in the trial of the case?

A. I believe I would, yes, sir, because I don't want to take a life.

We said in *Hulsey* that the trial judge had the opportunity to observe the prospective juror and was in a position to weigh her somewhat contradictory versions in order to determine whether she was qualified under the *Witherspoon* rule. In such situations the trial judge has some discretion, a matter which the majority has totally ignored.

I cannot reconcile the majority holding with our cases involving the death penalty. It is not for us to judge whether a prosecuting attorney should attempt to qualify a jury for the maximum punishment. While it is a practice that ought to be used with care, because it can be abused, neither I nor the members of this court have the duty and responsibility of a prosecuting attorney to represent the best interests of the State. Our role regarding trial tactics is to review their legality, not advisability. Obviously a prosecuting attorney would be derelict in his duty if he did not in some cases seek the maximum punishment — from the beginning. In performing that duty he should be able to remove people from a jury panel who will not under any circumstances consider the maximum punishment. No doubt some people have strong feelings about certain crimes and would not impose a maximum sentence, although the facts might warrant it.

The prosecutor in this case was simply trying to get a jury that *could, if it so determined*, award the maximum punishment. The majority presumes that the jurors chosen would automatically vote for a maximum sentence if they found the defendant guilty; I find no evidence to support that conclusion. The questions by the State were properly phrased to see if a venireman *could* impose a maximum sentence. That is permitted by law.

The majority's reference to the myriad of problems that will arise if we approve such trial tactics is, in my judgment, irrelevant. Prosecuting attorneys have for years inquired of prospective jurors concerning any prejudices that the jurors harbored regarding a particular offense or punishment. Just because that practice may cause us problems is no reason to deny the use of it. Our function is to solve problems, not avoid them.

In all due respect I feel the majority's decision reflects a misconception of our system of law, a system based on an adversary presentation of evidence. The State's attorney is obligated under that system to do all he can, within the law and ethical standards, to present the State's case in the best possible light. By law the State is entitled to have the case heard by 12 people who have not already decided, before the

trial, that a lawful sentence will not be imposed regardless of the circumstances. I feel the majority has denied the State that right — a decided departure from the principle of trial by advocacy.

FOGLEMAN, C.J. joins in this dissent.