Richard Phillip ANDERSON *v.* STATE of Arkansas

CR 82-69                                    644 S.W.2d 278

Supreme Court of Arkansas
Opinion delivered January 17, 1983

*William M. Cromwell* and *Sam Hugh Park,* for appellant.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. This is a companion case to *Perry* v. *State,* 277 Ark. 357, 642 S.W.2d 865 (1982). Perry was found guilty of capital felony murder and sentenced to death for the murder of Kenneth Staton and Suzanne Ware. Staton owned a jewelry store in Van Buren, Arkansas, and Ware was his daughter. They were killed when Perry and Anderson robbed the store on September 10, 1980.

Anderson was found guilty of murder in the first degree and sentenced to life imprisonment and a $15,000 fine. The evidence of his guilt was overwhelming, and essentially his defense was evidence in mitigation — that he did not know Perry was going to kill anyone during the planned robbery — and that he could not receive a fair trial. He raises ten arguments of error on appeal, all of which are meritless and we affirm his conviction.

Anderson met a young woman named Chantina Ginn at a carnival in Kansas. Together they followed the carnival

to Arkansas and camped at the Horseshoe Bend camping ground at Beaver Lake. Anderson and Ginn were traveling on his 1978 Harley-Davidson motorcycle with Florida license plates. At the campground Anderson and Ginn met Perry who was camped with a woman named Laura Lee. Perry used the name of Damon Peterson. The day after they met, Perry asked Anderson if he wanted to participate in the robbery of a jewelry store in Van Buren, Arkansas. Anderson agreed and they left the campground on September 8, 1981, on the motorcycle. They each had a black motorcycle helmet, carried some rope, and Perry carried a wig. They checked into the Terry Motel in Van Buren, and then Anderson went to Staton's Jewelry Store located in the Cloverleaf Plaza Shopping Center. On the 10th of September, at about 5:00 p.m., they robbed the store, taking innumerable rings, watches, and other jewelry. Anderson went in first to get the attention of the owner or clerks. Perry then came in the store. Anderson, as instructed by Perry, drew a loaded .38 pistol and held it on Staton; then Perry drew a .22 caliber pistol which had a silencer attached. They led Staton and Ware to a back room, tied and gagged them, and Perry shot them twice in the head. Anderson said Perry told him he shot them because he did not want to leave any witnesses. They gathered the jewelry in lightweight orange duffle bags, took the cash from the register, money from Staton's wallet and even his wedding ring.

They used Ware's Suzuki jeep to drive to where the motorcycle was parked. Then Anderson got on his motorcycle and met Perry at an apartment complex. They arrived back at the campground about 9:00 p.m. the third night after they had left. The jewelry and cash were sorted and divided and an attempt was made to burn all the tags and boxes. The police found remnants, however, and the State offered them as evidence. The next day Perry and Anderson went to Rogers, Arkansas, where they traded Perry's Cadillac for a Plymouth. Then all four went to Fayetteville, stored the motorcycle, two helmets and Perry's pop-up camper at Fayetteville Self-Service Storage and went to Florida. In Florida Anderson became involved in a fracas involving some shooting, was arrested and released on bond. He jumped his bond and went to Canada. He was arrested in

Vancouver, British Columbia, on January 14th, 1981, for suspicion of armed robbery of a bank. After several interviews he eventually told the authorities of the Van Buren robbery and murders. Ultimately he waived extradition and was tried in Fort Smith, Arkansas, beginning on the 6th day of October, 1981. Besides the confession there was an abundance of evidence which supported these facts.

Anderson's main argument of error focuses on the amount of pre-trial publicity this case received in the Fort Smith-Van Buren area and the fact this publicity permeated the community. He argues that the denial of his request for a continuance made it impossible for Anderson to receive a fair trial by an impartial jury.

There was a good deal of publicity about this case in the local community as we discussed in *Perry* v. *State, supra,* and the trial was moved from Van Buren across the river to Fort Smith at Anderson's request. Also, most of the prospective jurors admitted some knowledge about the murders and knowing the fact that two men were involved. Anderson himself was interviewed on television and said he did not kill anyone. An order was entered preventing him from further interviews during Perry's trial. The State sought the death penalty against Anderson and so qualified the jury. This meant there was an extensive and prolonged voir dire of veniremen to find a jury that could afford Anderson a fair trial. Anderson's trial took place one year after the crime, and two months after Perry was tried. The trial court, giving both counsel considerable leeway in questioning the veniremen, made certain that no juror was allowed to be seated who, in its judgment, could not set aside any information he had about the case and fairly and objectively judge and weigh the evidence, rendering a fair punishment if necessary. A considerable lapse of time had occurred since the crime was committed and we can find no reversible error in the denial of the request for the continuance. A defendant is not entitled to a trial before a jury composed of people completely ignorant of the alleged crime. *Irvin* v. *Dowd,* 366 U.S. 717 (1961); *Swindler* v. *State,* 267 Ark. 418, 592 S.W.2d 91 (1979), *cert. den.* 449 U.S. 1057 (1980). That would be virtually impossible in this day and time. People are

immediately, graphically, and thoroughly informed of such crimes by radio, newspapers, and television.

The question is always, was the defendant denied a fair trial because of pre-trial publicity; did he have a jury that could give him a fair trial. *Swindler* v. *State, supra.* We conclude Anderson received a fair trial by an impartial jury.

When this case is compared to cases cited by Anderson as authority for his argument there is no comparison. The notorious Sam Shappard case is cited as an example. *Sheppard* v. *Maxwell,* 384 U.S. 333 (1966). There are few if any similarities between Anderson's case and Sheppard's. The first trial of John Edward Swindler which occurred in this same vicinity is hardly comparable, where the trial took place within six months of the killing, and jurors admitted knowing of Swindler's previous crimes. In *Swindler,* one juror had worked with the father of the victim for seventeen years; and another juror had worked for the United States Marshal's office for eight years. *Swindler* v. *State,* 264 Ark. 107, 569 S.W.2d 120 (1978). None of that is present in this case.

It is suggested the trial judge injected himself into the voir dire process and improperly rehabilitated certain prospective jurors. What happened is that the defense was able to get certain prospective jurors to make statements that might subject them to challenge, if their answers were taken at face value. The judge did nothing improper in this case. In fact, he performed his duty as a trial judge should to see that veniremen understood their role under the law. In *Hobbs* v. *State,* 273 Ark. 125, 617 S.W.2d 347 (1981), we defined the proper role of a trial judge in such a case:

> The judge is supposed to direct the process, being given great discretion to insure that no undue advantage is gained. Sometimes the attorneys tend to take over the voir dire process and confuse the jurors. *See Haynes* v. *State,* 270 Ark. 685, 606 S.W.2d 563 (1980). Sometimes, especially in a death case, the judge has to step in, after the attorneys have questioned prospective jurors, to insure fairness. In the case of *McCree* v. *State,* 266 Ark.

465, 585 S.W.2d 938 (1979), for example, we approved the actions of a judge who clarified answers regarding the death sentence after both counsel had questioned a prospective juror. Even so, the judge cannot, in effect, step from the bench and aid either party and he cannot unfairly limit either party's right to seek twelve people who can render a fair and impartial verdict.

The trial judge did not act improperly in this case.

An extensive effort was made in the jury selection process to know exactly what each prospective juror knew of the case and his inclination toward the death penalty. A study of the record produces no basis on which to find the trial court abused its discretion in allowing a juror to sit or in refusing to disqualify one for cause. There may be room for argument in some instances such as in the questioning of juror Allen Gushea who seemed inclined to prefer the death penalty for "cold-blooded" murder. But that position was clarified by the trial court's impartial questions. Actually, since Anderson received a life sentence instead of death, and was not convicted of capital murder, but instead only murder in the first degree, most of Anderson's arguments relating to the jury's prejudice lose their force.

Anderson also argues that it was error for the trial court to refuse to sequester the jury because of the crime that had occurred in the community during his trial. On appeal we are not told by Anderson what that crime was, or how it could have prejudiced the jury against him. The court agreed to and did admonish the jury against watching, reading, or listening to any news. Whether to sequester the jury is within the discretion of the trial judge. Ark. Stat. Ann. § 43-2121 (Repl. 1977); *Perry* v. *State, supra; Hutcherson* v. *State*, 262 Ark. 535, 558 S.W.2d 156 (1977).

Anderson's counsel did ask the court to remove the trial to a site beyond the judicial circuit which is composed of only two counties: Sebastian where Fort Smith is located, and Crawford where Van Buren is located. The trial judge said he could not do that under the present law, and that statement was not entirely correct. If the question is whether

a defendant can or cannot receive a fair trial, as required by the fourteenth amendment to the United States Constitution, then conflicting law must give way to a defendant's right to due process.[1] As we observed in *Perry* v. *State, supra,* if the trial court determines a defendant cannot receive a fair trial, then it has the power to remove the case to some county in an adjoining judicial circuit. The trial court made no such determination, and we find on review of the record Anderson did receive a fair trial; that is, he was tried by a jury that met constitutional standards. Therefore, the court's statement cannot be a basis on which to reverse the conviction; nor do we find that the second motion for a change of venue should have been granted.

Anderson made two statements to Canadian authorities, one in writing and one to a man planted in Anderson's cell by the authorities. He argues that these statements were inadmissible because the Canadian authorities did not tell Anderson he had a right to an attorney. He argues that he was a frightened foreigner in a strange situation and the statements, if given in the United States, would have been inadmissible and, therefore, they should be inadmissible in the Arkansas case against him. He cites two federal cases which recognize that our law does not prevent a confession in a foreign country from being admitted simply because of lack of procedures dictated by *Miranda* v. *Arizona,* 384 U.S. 436 (1966); *United States* v. *Nolan,* 551 F.2d 266 (10th Cir. 1977) *cert. den.* 434 U.S. 904 (1977) and *United States* v. *Heller,* 625 F.2d 594 (5th Cir. 1980). In *Heller, supra,* the fifth circuit court of appeals found two exceptions to that rule: If the foreign authorities were acting as agents for their American counterparts, of which Anderson conceded there is no evidence, or if the interrogation is "shocking." Of course there is nothing at all in the record in this case that shocks us. There is not even any suggestion Anderson was harmed, threatened or mistreated in any way. So the court properly introduced the statements.

Anderson also argues that his inculpatory statements to Arkansas law enforcement officials, made subsequent to his

---

[1]ARK. CONST. art. 2, § 10 permits a change of venue only to another county in the same judicial district.

Canadian statements, should also be suppressed because they were tainted by the illegality of the Canadian statements. We do not find that the Canadian statements were illegal, so the subsequent statements are not. Neither do we find that Anderson did not make a voluntary and knowing waiver of his rights to remain silent and have an attorney present when he made the statements to the United States' officials. Anderson's only basis for arguing that the American statements were not voluntary is that he was not told that death was a possible penalty for the crime of which he was suspected. *Miranda* v. *Arizona, supra,* does not require such a warning, and we will not expand *Miranda* by so holding, as Anderson asks us to do.

Photographs, the same as those used in the trial of Perry, were introduced in Anderson's trial. *See Perry* v. *State, supra.* The defendant was charged as one of two defendants in the brutal, senseless murders and the ultimate penalty was sought. The photographs merely showed the bodies of the two victims as they were found after Anderson and Perry left them. They were not so highly prejudicial as to deprive Anderson of a fair trial.

The State solicited from Staton's widow a statement that Staton had to use crutches and it is argued this was irrelevant evidence used merely to inflame the jury. We cannot say beyond a reasonable doubt this evidence amounted to reversible error. Actually the jury seemed to fairly judge Anderson and accept his statement that he did not know Perry would kill anyone; he was charged with capital felony murder, but only found guilty of first degree murder. Anderson's approach to his guilt in this matter ignores another possible view of his conduct. Anderson agreed after casually meeting a total stranger to take a loaded gun and rob a jewelry store; he agreed to do exactly what Perry told him, being the first to pull his gun in the robbery. In view of these facts his legal guilt in the murders cannot be diminished by what he conceives as innocence on his part.

We have reviewed the transcript for any other prejudicial errors, as we are required to do, and have found none.

Affirmed.