Cite as 2024 Ark. 24

# SUPREME COURT OF ARKANSAS

**No.** CR-23-603

| | | |
|---|---|---|
| WILLIAM NELSON | | **Opinion Delivered:** February 22, 2024 |
| | APPELLANT | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43CR-20-410] |
| V. | | |
| | | HONORABLE BARBARA ELMORE, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED ON DIRECT APPEAL; CROSS-APPEAL DISMISSED. |

**CODY HILAND, Associate Justice**

William Nelson was convicted by a Lonoke County jury of first-degree domestic battery, for which he was sentenced to eight years in the Arkansas Department of Correction. On direct appeal, Nelson argues (1) substantial evidence does not support his conviction; (2) the circuit court's refusal to recuse was an abuse of discretion; (3) the circuit court improperly denied his *Batson* objection; (4) the circuit court abused its discretion by limiting questions regarding sentencing during voir dire; (5) the circuit court allowed inadmissible prior-bad-acts evidence to be introduced; (6) refusal to dismiss a juror for-cause during trial was an abuse of discretion; and (7) the circuit court improperly restricted expert-witness testimony or, alternatively, erred by denying a motion for a continuance to obtain a new expert. On cross-appeal, the State argues the circuit court misinterpreted the statutory requirement to support a sentencing enhancement and improperly granted Nelson's directed-verdict motion on the issue. We affirm on direct appeal and dismiss the cross-appeal.

## I. *Facts*

On May 21, 2020, Chelsea Spedowski (Chelsea) left her two-year-old son, Minor Child 1 (MC1), in the sole care and custody of her fiancé, William Nelson (Nelson). Chelsea and Nelson lived together with Chelsea's son, MC1, and Nelson's one-year-old daughter, Minor Child 2 (MC2). At some point that morning, Nelson allegedly heard a noise from MC1's bedroom and found MC1 lying on the carpet unresponsive. Nelson called Chelsea's mother, Tina Ognoskie (Tina), who lived next door. Tina rushed to assist and found Nelson holding MC1's unconscious body at his back door. In the midst of trying to determine whether MC1 was breathing, she asked Nelson if he had called 911, to which he responded he had not. While waiting on emergency personnel, Tina told Nelson to rush MC1 to a neighboring nurse's home in hopes she could help. While Nelson was running with MC1 in his arms, a former police officer, Matthew Thomas (Thomas), saw MC1's limp and lethargic body and immediately knew something was wrong. Thomas took MC1 from Nelson, rendered first aid as MC1 seized, and waited with the family until the authorities arrived.

MC1 was taken by ambulance to Arkansas Children's Hospital (ACH). Upon arrival, MC1 was quickly evaluated and promptly sent for a CT scan, wherein the doctors discovered he was suffering from a severe brain bleed, or subdural hematoma, that required immediate emergency surgery. Chelsea arrived at the hospital mere minutes before surgery but in enough time to observe MC1 prior to his transfer to the operating room. She noted his eyes were fixed to one side, and he did not acknowledge or recognize her due to his

2

continued state of unresponsiveness. Chelsea observed MC1's apparent facial injuries and testified that her son was unharmed when she left for work earlier that morning.

Because MC1 was taken to ACH with an "altered mental status," or abnormal level of consciousness, the emergency room physician notified Dr. Rachel Clingenpeel, a pediatrician who specializes in "child abuse pediatrics." According to Dr. Clingenpeel's testimony, it is her job to evaluate for possible child abuse or neglect by "applying the most current [scientific] evidence and knowledge to [a] diagnostic process to come up with the most accurate diagnosis that [she] can."

Dr. Clingenpeel observed "fresh" bruises on MC1's forehead, redness on the back of his left thigh, and bleeding from his mouth due to a superior labial frenulum tear. Once in surgery, the neurosurgeon, Dr. Tomoko Tanka, found that a major tear in a branch of the large venous system was the source of the bleeding that caused the "acute, organized clot."[1] Both Dr. Tanka and Dr. Clingenpeel confirmed, without hesitation, that MC1 would have died, rather quickly, without the emergency surgery. In Tanka's expert opinion, the cause of the injury was "something very – forceful trauma."

Dr. Clingenpeel's medical opinion on causation was significantly more detailed, as was justified by her unique expertise in the field. She testified that when a child has such a life-threatening head injury, as MC1 did, "usually the cause is very obvious"—a car accident, a high-force trauma event, a fall from a substantial height, such as a multistory fall, but *not* from tripping and falling at home. Ultimately, the complete lack of explanation from

---

[1]Notably, the pathology results are significant to prove MC1's brain injury was one of a very recent nature—"half an hour to a couple hours before surgery."

Nelson as to how MC1 incurred such traumatic brain damage, combined with the fact that the subdural hemorrhage was not MC1's only injury—a variety of other injuries on multiple body surfaces existed with "each separate bruise or laceration representing a separate site of blunt-force trauma to [MC1's] body"—all contributed to her conclusive diagnosis of physical child abuse, including "abusive head trauma."

The State charged Nelson with one count of first-degree domestic battery and sought an enhanced sentence because the battering was committed in the presence of a child. After a two-day jury trial,[2] at the conclusion of the evidence, the circuit court granted a directed verdict and dismissed the sentencing enhancement sought by the State. The case was submitted to the jury, which found Nelson guilty of domestic battery as charged. Both Nelson and the State timely filed their corresponding appeals.

## II. *Direct Appeal by Nelson*

## A. Sufficiency of the Evidence

In Nelson's first point on appeal, he argues that substantial evidence does not support his domestic-battery conviction. In reviewing a sufficiency challenge, we view the evidence in the light most favorable to the State, considering only the evidence that supports the verdict. *McCray v. State*, 2020 Ark. 172, 598 S.W.3d 509. This court will affirm a conviction if there is substantial evidence to support it. *Hinton v. State*, 2015 Ark. 479, at 2, 477 S.W.3d 517, 520. "Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting

---

[2]The jury trial took place on May 3–4, 2023, approximately three years after the alleged incident occurred.

to speculation or conjecture." *Id.*, 477 S.W.3d at 520. Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* at 6, 607 S.W.3d at 496.

A person commits domestic battery in the first degree when the person knowingly causes serious physical injury to a household member he knows to be twelve years of age or younger. Ark. Code Ann. § 5-26-303(a)(4) (Supp. 2019). There is no dispute that MC1 was a household member under the age of twelve. Nelson, however, argues there was insufficient circumstantial evidence that Nelson knowingly caused serious physical injury to MC1. Specifically, Nelson believes that there are three potential "reasonable" conclusions as to the causation of MC1's injuries: (1) William Nelson; (2) Chelsea Spedowski; or (3) "No one"—as it was an accident. He is mistaken.

Here, the State presented substantial evidence for the jury to conclude that Nelson knowingly caused serious physical injury to MC1. It was undisputed that MC1 was left alone in Nelson's care. Chelsea testified that she awakened MC1 on the morning in question, he was responsive and alert, "jabbering" to himself in bed before she took him into the living room to watch cartoons, and he did not have the visible injuries to his face when she left the house. It is further undisputed that MC1's injuries were not only serious, but also life-threatening. Both of the State's medical experts, Dr. Tanka and Dr. Clingenpeel, concluded the injuries were recent and would have been fatal without medical intervention. As stated *supra*, Dr. Clingenpeel opined in great detail that the cause of MC1's

5

head trauma was something "exceptional to match the exceptional nature of [his] injury." She stated it is common for ACH to treat children with simple, uncomplicated head injuries resulting from accidents like short-distance falls or "things that kids can do at home" like "climbing on the furniture" but reiterated that MC1's injury was anything but common. In combination with MC1's other injuries with "predictive value"—injuries with some association with child abuse—Dr. Clingenpeel's clinical diagnosis was that of nonaccidental, physical abuse.

As a result, the jury reasonably concluded that MC1's injuries were not accidental or committed by MC1's mother but by Nelson—a theory offered by Nelson himself. Accordingly, as substantial evidence supports the verdict, we affirm.

## B. Recusal of Circuit Judge

Nelson's second argument is the circuit judge, Barbara Elmore (Judge Elmore), was required to recuse herself from the criminal proceeding because she had "presided over" the termination of Nelson's parental rights of MC2 in juvenile court. We review a circuit judge's denial of a motion to recuse under an abuse-of-discretion standard. *Irvin v. State*, 345 Ark. 541, 49 S.W.3d 635 (2001).

In his written motion filed April 30, 2023, just two days before the jury trial was set to begin, Nelson cites both the Code of Judicial Conduct and the concurring, notably not the majority, opinion in a previous case decided by this court.[3] Rule 2.11(A)(6)(d) of the Arkansas Code of Judicial Conduct states that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including

---

[3]*Ferguson v. State*, 2016 Ark. 319, 498 S.W.3d 733.

but not limited to the circumstance in which the judge previously presided as a judge over the matter in another court." Ark. Code Jud. Conduct R. 2.11(A)(6)(d). Nelson claims that because the same allegations for his battery charge formed the basis for a petition to terminate Nelson's parental rights, and because Judge Elmore ultimately signed the order terminating those parental rights, Judge Elmore "must recuse accordingly."

Despite admitting that the majority holding in *Ferguson* does not stand for the principle that a dependency-neglect proceeding and a corresponding criminal case constitute the same "matter" to require disqualification under the rules, Nelson nonetheless asks this court to extend its holding and mandate Judge Elmore's recusal in the case at hand. While the facts in *Ferguson* may appear to resemble those in Nelson's case, there are several key distinctions that make it distinguishable.

Jacqueline Ferguson (JF) is a mother who was the subject of a child–abuse investigation that ultimately led to a dependency-neglect (DN) adjudication terminating her parental rights, as well as a conviction for criminal charges based on those allegations. The adjudication, which took place prior to any criminal proceedings, was heard by Judge Elmore. As the sole fact-finder in the DN case, Judge Elmore heard the testimony of witnesses and evaluated key evidence in order to reach her conclusion that the allegations were substantiated by the requisite proof. At the conclusion of the hearing, Judge Elmore stated from the bench that "there was physical abuse of the child . . . . I don't see how you can find anything else." *Ferguson*, 2016 Ark. 319, at 2, 498 S.W.3d at 735. In consideration of such, when Judge Elmore was subsequently assigned the criminal matter, JF filed for

Judge Elmore's recusal, citing both Rule 2.11(A)(1)[4] and (6)(d) of the Code of Judicial Conduct. In addition to denying JF's recusal motion, Judge Elmore denied JF's jury-trial waiver to alleviate JF's stated concerns that Judge Elmore could not be impartial and unbiased in a bench trial to determine her criminal liability.

This court's majority decision to reverse on Judge Elmore's refusal to recuse herself was predicated on only one thing—"[t]he fact that Judge Elmore found that [JF's] questioning of her impartiality required her to withdraw as the finder-of-fact, in essence, demonstrates that the questioning of [Judge Elmore's] impartiality was reasonable." *Ferguson*, 2016 Ark. 319, at 2, 498 S.W.3d at 737. Thus, despite JF's arguments, the court's holding implicated *only* Rule 2.11(A)'s component of "reasonably questioned impartiality," but *not* the "personal knowledge" factor of Rule 2.11(A)(1) or the element that a judge "presided over the matter in another court" as required by Rule 2.11(A)(6)(d). In fact, the majority specifically rejected JF's argument that the knowledge Judge Elmore acquired in a judicial proceeding, i.e., the DN adjudication, is the "personal knowledge" that would require disqualification pursuant to Rule 2.11(A)(1). Despite the concurrence stating that Judge Elmore's presiding over both the DN proceeding and the criminal case should have implicated Rule 2.11's prohibition against a judge presiding over a case when she has already presided over the matter in another court—that matter being the abuse of JF's child—that is neither binding precedent, nor is that what happened here. Thus, the concurrence upon which Nelson improperly relies is inapposite to this case.

---

[4]A judge shall disqualify herself in any proceeding in which the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. Ark. Code Jud. Conduct R. 2.11(A)(1).

8

Here, while it is true that Judge Elmore signed a written termination order involving Nelson, she did not preside over the adjudication—another circuit court judge did—and thus, she did not hear any testimony of witnesses, weigh any evidence, or make any factual findings. Furthermore, the DN proceedings here were for the circuit court to determine whether Nelson's daughter, MC2, should be adjudicated as dependent-neglect, whereby Nelson's parental rights could be terminated. The criminal charges, however, were based on Nelson's alleged abuse of Chelsea's son, MC1. Finally, despite a different judge presiding over the adjudication, a factual determination in the DN case regarding Nelson's actions was ultimately unnecessary, as Nelson eventually consented to the termination. Because he voluntarily relinquished his parental rights to MC2, that eliminated the requirement that any judge make a finding of fact that Nelson committed child abuse of either MC1 or MC2. Judge Elmore specifically noted her only finding was that the child was adoptable.

This case was decided by a jury at Nelson's request. Judge Elmore did not preside over the DN adjudication, and unlike the facts in *Ferguson*, Nelson did not allege any bias or prejudice that would have led Judge Elmore to the conclusion that her impartiality might have been reasonably questioned. In light of the circuit court's specific consideration of the applicable law, we cannot say the refusal to recuse under Rule 2.11 was an abuse of discretion.

## C. *Batson* Challenge

In his third point, Nelson asserts that the circuit court erred by overruling his *Batson* objection to the State's peremptory strike of venire member Marcie Anderson. Specifically,

9

the basis of his objection was that Ms. Anderson was the only person of color who appeared on the panel; thus, the State has "struck one of one."

Pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), the State in a criminal case may not use its peremptory strikes to exclude jurors solely on the basis of race. *Jackson v. State*, 375 Ark. 321, 290 S.W.3d 574 (2009). Once a challenge is made, the circuit court must conduct a three-step inquiry to determine whether a *Batson* violation occurred. *McMiller v. State*, 2014 Ark. 416, 444 S.W.3d 363. First, the opponent of the peremptory strikes must present facts to make a prima facie case of purposeful discrimination. *Id*. Second, upon a showing of a prima facie case of systematic discrimination, the State is required to give a race-neutral explanation for the strikes. *Id*. Unless discriminatory intent appears in the prosecutor's explanation, the reason given will be considered race neutral. *Flowers v. State*, 362 Ark. 193, 204, 208 S.W.3d 113, 122 (2005). Third, the circuit court must decide whether the opponent of the strike has proved purposeful discrimination. *McMiller, supra*. On appeal, we will not reverse a circuit court's findings on a *Batson* objection unless the decision is clearly against the preponderance of the evidence. *Id*. Some deference is accorded the circuit court in making this decision because it has the opportunity to observe the parties and determine their credibility. *London v. State*, 354 Ark. 313, 125 S.W.3d 813 (2003).

After the defense's *Batson* challenge was made, the following exchange occurred:

THE COURT: Okay. Why did you strike Ms. Anderson?

PROSECUTOR: Didn't like her answers and she seemed liked she didn't want to be here and so we thought that she would not be a -- would not be a good juror, that she wouldn't pay attention. She seemed to -- Judge, she just seemed annoyed by being here for answers and by her demeanor.

10

DEFENSE COUNSEL: Your Honor, our response would just be that I think that describes a majority of the jurors that were on the panel and are sitting out in the -- in the crowd.

THE COURT: Yeah.

DEFENSE COUNSEL: Not unique to her.

THE COURT: I -- I agree with -- I think that they had a valid reason to strike Ms. Anderson.

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: And I don't see that race is a problem in this particular case especially.

Here, after defense counsel objected to the striking of Anderson, the State gave a race-neutral explanation, which the circuit court accepted as valid. As the defense failed to prove purposeful discrimination, and because we defer to the circuit court as the arbiter of credibility in its superior position to observe both Anderson's level of interaction and the prosecutor's demeanor in asserting its race-neutral reason, we hold that the circuit court's decision to deny the *Batson* claim is not clearly against the preponderance of the evidence, and we affirm on this point.

### D. Voir Dire Regarding Sentencing

Nelson's fourth argument on appeal is that the circuit court abused its discretion by improperly restricting Nelson's questions about potential sentences during voir dire. The extent and scope of voir dire examination of prospective jurors falls within the circuit court's sound discretion, and the latitude of that discretion is wide. *See Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004). Accordingly, we will not reverse voir dire restrictions unless that discretion is clearly abused. *Reid v. State*, 2019 Ark. 363, 588 S.W.3d 725. An abuse of

11

discretion occurs when the circuit court acts arbitrarily or groundlessly. *Id*. The judge shall initiate voir dire by identifying the parties and their respective counsel, revealing any names of prospective witnesses, and briefly outlining the nature of the case. Ark. R. Crim. P. 32.2(a) (2019). But beyond these four requirements, counsel may ask additional questions only "as the judge deems reasonable and proper." *Id*. We will not reverse for nonprejudicial errors in jury selection. *See, e.g., State v. Vowell*, 276 Ark. 258, 634 S.W.2d 118 (1982).

For support that the circuit court abused its discretion, Nelson cites *Dillard v. State*, 363 Ark. 491, 215 S.W.3d 662 (2005). In *Dillard*, when the defense counsel asked the jury panel whether anyone was "uncomfortable with the penalty range being 10 to 40 years, or life" in prison, the State objected. The court sustained the State's objection and said counsel could only ask whether the panel could consider the full range of penalties but could not tell the jury what the range was. *Id*. at 493. We held that the court abused its discretion because counsel was permitted to determine "whether the jurors could consider the term of years for aggravated robbery provided by law." *Id*. at 495.[5] In reaching this conclusion, the *Dillard* court examined three earlier cases: *Haynes v. State*, 270 Ark. 685, 606 S.W.2d 563 (1980); *Stephens v. State*, 277 Ark. 113, 640 S.W.2d 94 (1982); and *Felty v. State*, 306 Ark. 634, 816 S.W.2d 872 (1991).

In *Haynes*, we reversed a conviction after determining the State's "whole line of questioning" revealed the intent to impanel a jury that would vote for the maximum sentence upon a finding of guilt. 270 Ark. at 692, 606 S.W.2d at 566. The court noted that

---

[5]Ultimately, this court did not reverse, however, because the defendant was sentenced to the statutory minimum sentence, and thus, the court found no prejudicial error.

the purpose of selecting a jury is to obtain a panel that will be fair and impartial to the accused, as well as to the State. *Id.* at 690, 606 S.W.2d at 565. After recognizing that several members of the venire were excluded because they expressed reservations about assessing the combined maximum possible sentence, this court held that because the members of the jury "were not chosen upon their promise to consider the full range of penalties provided by law" and because of the unfairness of the type of questions presented to the venire, the questions clearly constituted prejudicial error. *Id.*

In *Stephens*, after stating the minimum and maximum penalties for the crimes charged, the State asked the prospective jurors whether they would consider the maximum penalty. We held this to be permissible as "the jurors were asked only whether they would consider all the penalties provided by law," as opposed to the *Haynes* jury being "asked to commit to a possible penalty or to express an opinion on whether such a penalty would be suitable." 277 Ark. at 115, 640 S.W.2d at 95.

In *Felty*, the prosecutor informed the venire that the defendant was charged with two counts of a Class Y felony—which carries from ten to forty years, or life. "Is there anyone here, if they found that [the defendant] committed these acts, that could not sentence him to a long term in the penitentiary?" 306 Ark. at 636, 816 S.W.2d at 873. We, again, held it was permissible for the State to ask the jury whether it could impose the maximum sentence. *Id.*

Nelson was charged with first-degree domestic battery—which by law allows for a potential fine not exceeding $15,000, a prison sentence of not less than five years or more than twenty years in the Department of Correction, or both. Unlike in *Dillard*, the defense

13

did not propose to give the specific penalty range and ask if the panel was comfortable considering it. In fact, the record is void of the aforementioned penalty range during either party's arguments regarding voir dire. Here, an entirely different line of questioning prompted the State's objection: "Do you think a felony conviction is a punishment in and of itself[?]" In the bench conference, defense counsel explained to the circuit court that he wanted to ask the jury "whether they would consider a fine only for a felony offense[.]" Despite his argument on appeal, Nelson was not prohibited from inquiring whether the jury was comfortable with the sentencing options for the charged acts because that is not the question he offered. Ultimately, the circuit court stated that the defense was permitted to ask the jury if they could abide by the instruction of the law. "All you have to do is if they – if we have the instructions from the Court, can they follow the instructions?" They were permitted to ask "from the minimum – to the maximum. That's it." Counsel for both the State and Nelson resumed questioning without further inquiry of the circuit court into permissible questions. Notably, neither party asked another question pertaining to sentencing.

Although our case law holds that it is not an abuse of discretion for the circuit court to allow the State to ask whether jurors could consider a statutory maximum penalty, it does not, in turn, hold that the circuit court *does* abuse its discretion by preventing defense counsel from asking whether jurors would consider the minimum punishment for a felony offense when the entire range of punishment is not offered. Ultimately, the latitude on whether the circuit court allows extensive voir dire about punishment is within the court's wide discretion. It was within the circuit court's purview whether to restrict a specific

14

question asking the panel to commit to the minimum punishment prior to hearing the evidence. This court previously cautioned that allowing questions aimed to qualify jurors for a specific punishment prior to the presentation of the case will not only result in the inevitable pursuit of the accompanying challenges for cause, but would also lead to the trial process becoming "greatly burdened and expanded in time and expense." *See Haynes*, *supra*.

In light of the foregoing, it cannot be said that the circuit court acted arbitrarily by restricting Nelson's voir dire questions; thus, we hold that no abuse of discretion occurred.

Additionally, as was noted by the circuit court in *Dillard*, defense counsel announced the jury was acceptable to the defense and identified no juror who had been prejudiced by the circuit court's ruling. In fact, verdict form AMI Crim.2d 9303 was given and specifically listed the full range of the permissible sentences for Nelson's crime. The jury came back with a sentence on the lower end of the spectrum—eight years. Although this was not the statutory minimum sentence as in *Dillard*, it was an intentional sentence specifically chosen by the jury panel to fit Nelson's conviction based on the evidence presented. Because Nelson fails to demonstrate how any member of the seated jury prejudiced the verdict, we affirm.

## E. Ark. R. Evid. 404(b)

For his fifth argument, Nelson argues that the circuit court erred in admitting three segments of Chelsea Spedowski's testimony because he claims the statements were

15

inadmissible under either Ark. R. Evid. 404(b) or Ark. R. Evid. 403.[6] Ark. R. Evid. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2004). Evidence is not admissible under Rule 404(b) simply to show a prior bad act. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. Rather, the test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. Evidence of circumstances that explains the act, shows a motive, or illustrates the accused's state of mind, may be independently relevant and admissible. *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231 (1997). A circuit court's decision to admit evidence is entitled to great weight and will not be reversed absent an abuse of discretion. *Cook v. State*, 345 Ark. 264, 268, 45 S.W.3d 820, 822 (2001). Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Lard v. State*, 2014 Ark. 1, 431 S.W.3d 249.

---

[6]The record demonstrates that Nelson sought exclusion of the evidence at issue pursuant to Rule 404(b) and argued relevancy, but, as to the second and third objections, he did not assert that the evidence should be excluded pursuant to Rule 403. This argument was not presented to the circuit court, and therefore, we do not reach the issue on appeal as it relates to these two objections. *See Atwood v. State*, 2020 Ark. 283.

Here, Nelson claims the circuit court abused its discretion by permitting the State to introduce evidence about (1) "Nelson's status with his ex Chelsea that created [an] inference Nelson was dating two women at once;" (2) "Nelson's prior discipline of the children in his home;" and (3) "Nelson's turbulent communications with his ex [Brandi]." He contends the evidence should have been excluded because it had no independent relevance.

The first objection stemmed from a question posed to Chelsea regarding Nelson's relationship status with his daughter's mother, Brandi, at the time Chelsea moved in with Nelson: "Was [Nelson] divorced from -- from his – [MC2]'s mother, or were they separated; do you recall?" Defense counsel argued that Nelson's status with Brandi was irrelevant as to whether he committed the battery. "It's not relevant at all. It's 404(b), prior bad acts. I mean, adultery is a -- is a bad act." However, upon a review of the record, Chelsea's testimony contains no such inference of adultery as indicated by Nelson. As the record is void of testimony alleging a "prior bad act" existed, no further analysis of exclusion under Rule 404(b) is required. Additionally, because the testimony contained no unfairly prejudicial information, the circuit court did not abuse its discretion in denying the motion to exclude pursuant to Rule 403.

The second objection arose when Chelsea was asked about Nelson's discipline of the children when he was angry. Defense, again, argued the "same objection, relevance, 404(b)." Ultimately, Chelsea testified that Nelson "spanked a little harder" when he was angry and would yell or raise his voice when speaking to the children.

The third and final objection occurred when Chelsea was prompted to describe Nelson's reactions to telephonic communications with Brandi, to which her testimony was

that Nelson "would get mad and storm off into the bathroom and shut the door and sit in there" after receiving texts or calls from her.

In response to each objection, the State maintains the evidence was independently relevant as to Nelson's state of mind on the day of the incident, as well as evidence of intent and absence of mistake or accident. Specifically, Nelson's defense to the battery charge was that MC1's injuries could be the result of an accident. This defense triggered the admission of evidence by the State to rebut his defense. *See Atwood v. State*, 2020 Ark. 283, at 22–23. Further, because Chelsea testified that Nelson was on the phone with Brandi prior to her leaving for work the morning in question, it was proper to admit evidence as to Nelson's state of mind. Thus, the evidence was not offered to show the bad character of Nelson as he contends; rather, the evidence was independently relevant proof of Nelson's state of mind and the absence of mistake or accident in committing the offense. As the decision to admit the evidence was not done thoughtlessly, the circuit court did not abuse its discretion. Accordingly, we affirm.

## F. Exclusion of Juror

Nelson's sixth point on appeal is that the circuit court abused its discretion by refusing to strike juror Leech for cause. Nelson contends Leech "made clear" that her prior relationship with the witness would afford him more credibility than the other witnesses; thus, the court's failure to excuse her as a juror was erroneous.

A juror is presumed to be unbiased and qualified to serve, and the burden is on the appellant to prove otherwise. *Smith v. State*, 343 Ark. 552, 567, 39 S.W.3d 739, 748 (2001). It is for the circuit court to decide whether a juror is qualified, and that finding will not be

reversed absent a showing of abuse of discretion. *Id.* We have held that the appellant must demonstrate prejudice in arguing that a juror should have been removed. *Id.* The burden is on the appellant to prove that a reasonable possibility of prejudice resulted from juror misconduct, and prejudice is not presumed. *Id.* Whether prejudice occurred is also a matter for the sound discretion of the circuit court. *Id.* at 567, 39 S.W.3d at 748–49.

Here, the issue came up in the middle of trial before the calling of State witness Matthew Thomas. Prior to Thomas taking the stand, the bailiff made the circuit court aware that juror Leech potentially knew the witness from her church. In response to such information, the court asked about the juror's ability to remain impartial. While Leech initially stated she would give Thomas's testimony more weight than a witness of whom she had no personal knowledge, she ultimately affirmatively stated she could make her decision based solely on the evidence presented at trial. When asked if making a decision contrary to Thomas's testimony would make her uncomfortable, she replied that it would not. *See Jones v. State*, 374 Ark. 475, 479, 288 S.W.3d 633, 636 (2008) ("[A]ny uncertainties that might arise from the juror's response can be cured by rehabilitative questions."). Thus, the court appropriately determined Leech was an acceptable juror and did not abuse its discretion.

Moreover, Nelson did not, and cannot, prove the prejudice required for reversal. Thomas was an undisputed fact witness only—not a single portion of his testimony revolved around whether Nelson committed the crime for which he was charged. As Thomas' credibility was in no way questioned, Nelson, accordingly, cannot show how Leech's remaining on the jury made a difference in Nelson's guilty verdict. Therefore, we hold that

19

the circuit court did not abuse its discretion in refusing to strike this juror and that Nelson has failed to demonstrate that he was prejudiced by the circuit court's refusal, and thus, we affirm.

## G. Limitation of Expert Testimony

For his final point on appeal, Nelson argues the circuit court improperly restricted his expert's testimony as to causation of MC1's injuries. Arkansas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "The test of qualification as an expert is whether, on the basis of the witness's qualifications, he or she has knowledge of the subject at hand which is beyond that of ordinary persons." *Dollar Gen. Corp. v. Elder*, 2020 Ark. 208, at 13, 600 S.W.3d 597, 606. Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 371, 268 S.W.3d 905, 914 (2007).

The State moved to exclude the testimony of neuropsychologist, Dr. Garrett Andrews, on the basis that he was not a medical doctor and was not equipped to make medical findings. After careful consideration, the court permitted Andrews to testify but limited his testimony upon a finding that his practice as a neuropsychologist concentrated on treating the effects of traumatic brain injuries rather than determining their causes. The court stated, "He's not going to do a medical diagnosis on this child 'cause that's not really

20

his expertise." Simply put, Andrews was permitted to testify that he had previously treated brain injuries caused by accidents but could not opine that MC1's injuries specifically were the result of an accident.

Notably, the circuit court allowed Andrews to testify in exactly the manner in which Nelson proffered before the trial—that he would testify "about his expertise and the different causes of . . . these kind[s] of traumatic brain injuries in general." Nelson specifically offered the limitation that the circuit court ultimately imposed, suggesting the court could "narrow the scope" of Andrews's testimony to avoid challenging Dr. Clingenpeel's diagnosis of child abuse. Nelson now argues that the fact that Andrews did not personally treat MC1 should not have disqualified him "as Andrews reviewed the relevant medical records and was prepared to give an opinion based on that review and his personal experience *treating* such injuries." (Emphasis added.) Thus, even Nelson admits that Andrews's expertise was in treatment, not diagnoses. It was, therefore, not an abuse of discretion for the circuit court to determine that Andrews lacked the specialized knowledge of causation of MC1's injuries and to prohibit him from testifying as to whether MC1's injuries were caused by an accident.

As an alternative to the complete disqualification of Andrews, his only expert witness, Nelson moved for a continuance to obtain a medical doctor who could speak to causation. "The circuit court shall grant a continuance only on a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case." Ark. R. Crim. P. 27.3. The general standard of review for granting or denying a motion for continuance is abuse of discretion. *Green v. State*, 2012 Ark. 19, at 3, 386 S.W.3d 413,

21

415. In denying Nelson's motion for a continuance, the court made clear that this case was approximately three years old, and what defense was requesting "should've been done a long time ago."

Additionally, at the time Nelson argued for a continuance, Nelson believed Andrews was precluded entirely from testifying at trial. However, as the circuit court subsequently granted Nelson's motion for reconsideration and allowed Andrews to testify consistently with Nelson's proffered testimony at the pretrial hearing, no such prejudice resulted from the denial of a continuance to obtain a different expert. Neither the limitation of Andrews's testimony nor the denial of Nelson's motion for a continuance resulted from an abuse of discretion warranting reversal. We affirm.

### III. *Cross-Appeal by the State*

The State appeals from the circuit court's ruling directing a verdict on the sentencing enhancement pursuant to Ark. Code Ann. § 5-4-702 (Supp. 2019). The State argues the circuit court misinterpreted the statutory phrase "in the presence of a child."

Before we address the merits of the State's arguments, we must determine whether this is a proper State appeal. Pursuant to Rule 3(c) of the Arkansas Rules of Appellate Procedure–Criminal, the State's right to an appeal is limited. *State v. Brashers*, 2015 Ark. 236, 463 S.W.3d 710. This court has consistently held that there is a significant difference between appeals brought by criminal defendants and those brought on behalf of the State. *Id.* The former is a matter of right, whereas the latter is neither a matter of right, nor derived from the Constitution, but rather is only granted pursuant to the confines of Rule 3. *Id.* We accept appeals by the State when our holding would be important to the correct and uniform

administration of the criminal law. *Id.* As a matter of practice, this court has only taken appeals "which are narrow in scope and involve the interpretation of law." *State v. Banks*, 322 Ark. 344, 345, 909 S.W.2d 634, 635 (1995).

This court does not permit State appeals merely to demonstrate that the circuit court erred. *State v. Sprenger*, 2016 Ark. 177, 490 S.W.3d 314. We dismiss those appeals that do not present an issue of interpretation of the criminal rules with widespread ramifications and those appeals in which the resolution of the issue turns on the facts unique to the case or involves a mixed question of law and fact. *Id.* When an appeal merely raises an issue of the application, not an interpretation, of a criminal rule or statutory provision, we deem it to not involve the correct and uniform administration of the criminal law and thus not within the ambit of permissible State appeals under Rule 3. *Id.*

The State claims that the instant appeal involves an issue "purely of statutory interpretation" that is not dependent upon the facts of the case, but that "involves an issue with potential widespread ramification" and that such an opinion from this court would "help maintain uniformity throughout the State" and "provide guidance to circuit courts faced with similar circumstances." The State frames the issue on appeal as whether "the circuit court misinterpreted the statutory phrase 'presence of a child' and wrongly found that to prevail on the [sentencing] enhancement [pursuant to Ark. Code Ann. § 5-4-702] the State had to prove that Nelson's own child actually heard or saw the battering."

Pursuant to Ark. Code Ann. § 5-4-701(6), "in the presence of a child" means in the physical presence of a child or knowing or having reason to know that a child is present and may see or hear an act. By the State's own argument, the circuit court committed error by

23

"read[ing] the word 'may' out of the statute and substitut[ing] an atextual requirement that the State prove that a child actually see or hear the battery." Thus, while the issue presented in the State's appeal might appear, at first glance, to involve the interpretation of statutory language, what the State raises is actually an issue of application rather than interpretation.

It is clear that the circuit court based its decision to grant Nelson's motion for directed verdict as to the sentencing enhancement on the specific factual evidence presented at trial. The circuit court specifically said there was insufficient evidence that Nelson's daughter saw or heard the battery. "In this case I have nothing but pictures. All the evidence I've received of the house, nobody's told me anything about the size of the house or anything else. I believe [MC2] was there, but there's nothing here that tells me she heard it or she saw it."

Upon review of the circuit court's language in its bench ruling, the directed verdict on the sentencing enhancement was based on the unique facts of the case before it. While we understand the State desires a declaration that the circuit court misapplied the statutorily defined phrase "in the presence of a child" to the circumstances of this case, because the State's argument presents a mixed question of law and fact *and* because we do not permit appeals merely to demonstrate error of the circuit court, we hold the correct and uniform administration of criminal law does not require this court's review pursuant to Arkansas Rule of Appellate Procedure–Criminal 3(c) and dismiss the appeal.

Affirmed on direct appeal; cross-appeal dismissed.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen.; and by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.